# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

DENISE SCHMIDT,
　　　　　　*Plaintiff-Appellant,*

　　　　　　v.

CONTRA COSTA COUNTY; JUDICIAL
COUNCIL OF CALIFORNIA,
Administrative Office of the
Courts; CONTRA COSTA SUPERIOR
COURT; LAUREL BRADY; THOMAS
MADDOCK; LOIS HAIGHT; BARRY
BASKIN; KEN TORRE,
　　　　　　*Defendants-Appellees.*

No. 11-15563

D.C. No.
3:05-cv-00197-
VRW

OPINION

Appeal from the United States District Court
for the Northern District of California
Vaughn R. Walker, District Judge, Presiding

Argued and Submitted
July 19, 2012—San Francisco, California

Filed September 10, 2012

Before: Richard A. Paez and Jay S. Bybee, Circuit Judges,
and Sarah S. Vance,* Chief District Judge.

Opinion by Judge Paez

---

*The Honorable Sarah S. Vance, Chief District Judge of the Eastern
District of Louisiana, sitting by designation.

## COUNSEL

Geoffrey M. Faust, Clayton, California, for plaintiff-appellant Denise Schmidt.

Joseph E. Wiley (argued), Suzanne I. Price, and Joan Pugh Newman, Wiley Price & Radulovich, LLP, Alameda, California, for defendants-appellees Torre, Maddock, Brady, Haight, and Baskin.

Sharon L. Anderson, County Counsel, Monika L. Cooper (argued), Supervising Deputy County Counsel, Contra Costa County, Martinez, California, for defendant-appellee Contra Costa County.

## OPINION

PAEZ, Circuit Judge:

Plaintiff Denise Schmidt alleges that she broke an unwritten rule and suffered the consequences when she challenged a sitting superior court judge for his seat in a local election while she was serving as a temporary superior court commissioner. Schmidt lost her March 2004 election bid against an incumbent judge of the Superior Court of California, County of Contra Costa ("Superior Court"). Soon after, the Superior Court's Executive Committee adopted a policy rendering Schmidt ineligible to continue to serve as a temporary commissioner. Having lost the election and her position as a temporary commissioner, Schmidt filed this action under 42 U.S.C. § 1983 alleging, *inter alia*, that the Executive Committee adopted this policy in retaliation for her challenge to the incumbent judge in violation of her free speech rights under the First Amendment and the California Constitution. While the timing and targeted effect of the Superior Court's policy are certainly suspicious, we do not reach the merits of Schmidt's federal or state law retaliation claims because the judges of the Superior Court's Executive Committee enjoy legislative immunity for their decision to alter the minimum qualifications to serve as a temporary commissioner. We therefore affirm the district court's grant of summary judgment to the Defendants.[1]

## I.

Denise Schmidt became employed as an acting or tempo-

---

[1]In a separate memorandum disposition filed concurrently with this opinion we address and reject Schmidt's *Monell* claim against Contra Costa County, her claim of wrongful termination in violation of public policy against Court Executive Officer Ken Torre in his official capacity, and her challenge to the district court's denial of her request and motions for additional discovery.

rary commissioner for the Superior Court in 1998. Schmidt previously had been employed as a temporary commissioner by the Walnut Creek-Danville Municipal Court, but, as a result of the consolidation of the municipal and superior courts, in June or July of 1998 she automatically became employed as a temporary Superior Court commissioner. She was paid a per diem rate for her work, and was free to accept or reject days of work that she was offered.

Schmidt's correct job title is an issue of some debate between the parties. The district court described Schmidt as "an acting or temporary court commissioner." The documents from her appointment in 1998 classify her as a "temporary" court commissioner. Schmidt refers to her employment status in her First Amended Complaint as that of "Acting Court Commissioner." She also argues in her reply brief that she was a court commissioner *tout court*, and that the classification of "temporary court commissioner" does not exist. Although that classification may not exist currently, it did exist in Contra Costa County when Schmidt was appointed as a temporary commissioner for the Municipal Court. *See* Cal. Gov't Code § 73363 (1988), *repealed by* 2002 Cal. Legis. Serv. Ch. 784 (S.B. 1316), § 404. That section of the Government Code was repealed in 2002 following the consolidation of the municipal and superior courts, after which there was no longer any specific authority in the Government Code for the Superior Court to employ "temporary court commissioners." However, the Trial Court Employment Protection and Governance Act, Cal. Gov't Code §§ 71600-71675, which was a key piece of legislation in the consolidation process, guaranteed that pre-consolidation trial court employees would remain employed "at their existing or equivalent classifications." *Id.* § 71615(c)(1) (2008). Ultimately, though, whether the Superior Court had the authority to employ "temporary court commissioners" is beside the point; the parties agree that Schmidt was a subordinate judicial officer ("SJO"), and whether the Superior Court has the authority to regulate the qualifications of SJOs is a threshold issue for our analysis of

legislative immunity.[2] Whether Schmidt was a temporary court commissioner or an acting court commissioner is irrelevant to this inquiry.

Schmidt was an active member of the California Bar prior to her appointment as a temporary Superior Court commissioner in 1998 and remained active until at least 2001. At some point in late 2001 or early 2002, Schmidt telephoned the California Bar on an unrelated matter, and the Bar representative with whom she spoke informed her that, in light of her appointment as a court commissioner, it was appropriate for her to be in inactive status.[3] According to Schmidt, the California Bar then placed her in inactive status of its own accord, made her inactive status retroactive to her appointment as court commissioner in 1998, and refunded the active-status fees that she had paid for those years.

The Superior Court's Executive Committee[4] had been con-

---

[2]An SJO is "a person appointed by a court to perform subordinate judicial duties as authorized by article VI, section 22 of the California Constitution, including a commissioner, a referee, and a hearing officer." Cal. R. Ct. 10.701(a).

[3]The Rules of the State Bar of California specify that "a member serving for a court or any other governmental agency as a referee, hearing officer, *court commissioner*, temporary judge, arbitrator, mediator or in another similar capacity is eligible for enrollment as an inactive member if he or she does not otherwise [practice law or give legal advice] or hold himself or herself out as being entitled to practice law." R. State Bar Cal. tit. II, div. 3, R. 2.30(C) (2007) (emphasis added).

[4]According to the local court rules for the Contra Costa County Superior Court, "[t]he Executive Committee shall consist of the Supervising Judges of the Civil, Criminal, Juvenile, and Family Law Divisions and the Supervising Judges of each outlying geographic court location in Pittsburg, Richmond and Walnut Creek, all appointed by the Presiding Judge, as well as the Assistant Presiding Judge of the Superior Court. The Presiding Judge shall preside over the proceedings of the Executive Committee, but shall not be entitled to vote except to break ties." Contra Costa Cnty. Superior Ct. Local R. 4(A) (2000). Minutes from Executive Committee meetings, which were part of the summary judgment record, show that the four individual judges named as defendants in this action—Laurel Brady, Lois Haight, Barry Baskin, and Thomas Maddock—were all members of the Superior Court's Executive Committee.

sidering the issue of adopting a temporary or pro tem judges policy since at least August 2003, when Judge Lois Haight, a defendant in this action, prepared policy recommendations requiring that temporary judges be members of the California Bar for five years immediately preceding their appointment.[5] Handwritten notes on the draft policy by then-Presiding Judge Laurel Brady, another defendant, suggested adding a requirement that temporary judges be *active* members of the Bar. The draft policy was discussed at the August 28, 2003 Executive Committee meeting.

Also in 2003, Schmidt decided to challenge an incumbent judge, John Sugiyama, who was up for election in March 2004 after his appointment to the Superior Court in 2002. On November 5, 2003, Schmidt filed a "Declaration of Intent to Run," and took all other steps required to qualify as a candidate for Judge of the Superior Court. Schmidt campaigned from November 2003 until March 2004. According to Schmidt, her "inactive State Bar status became a campaign issue during the election," which she lost in March 2004, when Judge Sugiyama won a decisive victory.

Judge Haight stated in a declaration that she had no knowledge of Schmidt's candidacy. At her deposition, however, she confirmed that she donated money to Judge Sugiyama's campaign. The other individual defendants in this action—former Court Executive Officer Ken Torre, then-Assistant Presiding Judge Thomas Maddock, Judge Brady, and Judge Barry

---

[5]A temporary judge is "an active or inactive member of the State Bar of California who, under article VI, section 21 of the California Constitution and [the California Rules of Court], serves or expects to serve as a judge once, sporadically, or regularly on a part-time basis under a separate court appointment for each period of service or each case heard." Cal. R. Ct. 1.6(13). "On stipulation of the parties litigant the court may order a cause to be tried by a temporary judge . . . ." CAL. CONST. art. VI, § 21. While an SJO may sit as a temporary judge if she has the required qualifications and the parties' consent, a temporary judge is not classified as an SJO. Cal. R. Ct. 10.700(b), 10.701(a).

Baskin—were aware of Schmidt's candidacy. Judge Baskin was on Judge Sugiyama's election committee, held a fundraiser for Judge Sugiyama in his home, and donated money to Sugiyama's campaign committee.

On April 21, 2004, a month and a half after the election, the Executive Committee held its monthly meeting. The fifth item on its agenda was discussion of a "temporary judge policy" drafted by Judge Baskin. That draft policy document addressed only temporary judges—not commissioners or referees—and required them to be "active members in good current and historical standing of the State Bar of California for a minimum of five consecutive years immediately preceding appointment," and to sign a declaration so stating "on each day of service, before serving." Judge Baskin's draft policy was strikingly similar to Judge Haight's draft policy from the previous August. The Executive Committee discussed Judge Baskin's draft policy and decided to include "small claims appeals pro tem judges" in the program, and "it was moved, seconded, and APPROVED that the Assistant Presiding Judge oversee the Pro Tem Program . . . ." Judge Baskin was tasked with preparing amendments to the policy.

In May 2004, then-Chief Assistant Court Executive Officer Sherry Dorfman had a report drawn up reflecting the California Bar membership status of all pro tem judges, private judges, and temporary commissioners, which she provided to the Executive Committee at its next meeting on May 19, 2004. Schmidt was listed as "inactive" as of January 1, 1998. Only three other people were listed as "inactive": Temporary Commissioner Richard Calhoun,[6] Private Judge Stanley Dodson, and Private Judge Patrick Resen. On May 17, 2004, Schmidt applied for a permanent commissioner position at the

---

[6]Richard Calhoun was a former Superior Court judge who had either retired or been defeated in a re-election bid. The temporary judges policy, through all its iterations, never applied to retired judges. Moreover, Calhoun ceased working for the Superior Court in March of 2004.

Superior Court. Two days later, at its May 19 meeting, the Executive Committee discussed an amended version of the policy presented at the April meeting, and unanimously approved it. The May version of the temporary judges policy ("the Policy") also applied to temporary commissioners and temporary referees, and had an effective date of May 15, 2004. The Policy required all temporary judges, commissioners, and referees to "be active members in good current and historical standing of the State Bar of California for a minimum of five consecutive years immediately preceding each day of service."

Also on May 19, Commissioner Steven Houghton contacted Schmidt on his own initiative to inform her of the Executive Committee's decision and to tell her that she would no longer be able to sit as a temporary commissioner under the new Policy. According to Houghton, Schmidt's response was that "they were targeting her." Houghton informed Schmidt that Temporary Commissioner Calhoun and Houghton himself would no longer be eligible under the Policy and that "it wasn't about her." Houghton also offered to try to obtain a waiver of the active Bar membership requirement for Schmidt on account of the length of her service in the Superior Court.

Judge Maddock, then the Assistant Presiding Judge overseeing implementation of the Policy, learned on May 19 that Schmidt had telephoned a Superior Court staff member regarding her status as a temporary commissioner. Judge Maddock returned Schmidt's call the next day and read to her the paragraph of the Policy that set forth the criteria to serve as a temporary judge or commissioner, including the five-year active membership requirement. Following adoption of the Policy on May 19, Schmidt never again served as a temporary commissioner for the Superior Court.

The Policy was further revised at Executive Committee meetings in June and July, 2004. The June revision changed

the date that the Policy would go into effect to "May 15, 2004, or when revised, on subsequent dates of revision." The July revision added a sentence clarifying that the Superior Court's policy remained that "temporary judges and temporary commissioners have no employment rights and are not entitled to employment benefits."

## II.

Schmidt filed a complaint in federal court in January 2005 against Judge Maddock, Judge Brady, Judge Haight, and Judge Baskin ("the Judge Defendants"), and against Ken Torre, Contra Costa County, the Judicial Council of California, and the Contra Costa Superior Court. She filed a First Amended Complaint ("FAC") only against the Judge Defendants, Torre, and the County in April 2005, seeking monetary and injunctive relief (1) pursuant to 42 U.S.C. § 1983 for violation of her rights under the First, Fifth, and Fourteenth Amendments and the Bill of Attainder clause of the United States Constitution, (2) for violation of her analogous rights under the California Constitution, and (3) for wrongful termination in violation of public policy. Of the Judge Defendants, Schmidt sued Judge Maddock in his official and individual capacities, and Judges Brady, Haight, and Baskin in their individual capacities.[7] Schmidt also sued Torre in his official capacity. The district court granted the defendants' separate motions to dismiss the FAC in January 2006, dismissing all of Schmidt's claims with leave to amend. Schmidt then filed a Second Amended Complaint ("SAC") against only Torre, Judge Maddock, and Judge Brady in April 2006. These remaining defendants responded with a motion to dismiss, which the district court granted with prejudice in November 2006 as to all of Schmidt's SAC claims.

[7]Although Schmidt sued Judge Maddock in both his official and individual capacities, the charging allegations in the FAC and the arguments on appeal reflect that Schmidt sought relief against him only in his individual capacity.

Schmidt appealed, and we reversed and remanded in a memorandum disposition. *See Schmidt v. Contra Costa Cnty.*, 310 Fed. App'x 110 (9th Cir. 2009). We reversed "principally on procedural grounds," and therefore did "not reach the merits of each of Schmidt's claims." *Id.* at 112 n.1. As we explained in our disposition, we reversed because (1) the district court considered matters outside the pleadings in ruling on the defendants' motion to dismiss and treated it as a motion for summary judgment without complying with Rule 56 of the Federal Rules of Civil Procedure, and (2) the district court erred by concluding that Schmidt failed to state a First Amendment claim under 42 U.S.C. § 1983. *Id.* at 111-12.

On remand, Schmidt elected to go forward on her FAC. The Judge Defendants along with Torre again moved to dismiss the FAC for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure. In December 2009, the district court granted the motion with respect to all claims against the Judge Defendants and Torre for their role in promulgating the Policy, concluding that they were entitled to legislative immunity. The district court also concluded, however, that neither the Judge Defendants nor Torre was entitled to immunity from liability on Schmidt's claim that they applied the Policy to her retroactively. The district court therefore denied the motion to dismiss with respect to Schmidt's § 1983 First Amendment claim, but granted the motion with respect to her other claims. Schmidt also claimed that the Judge Defendants and Torre violated her rights under the California Constitution, but the rights that she identified were analogues of the rights she identified in the federal constitution; therefore, the district court also dismissed all of Schmidt's state-law claims other than her free speech claim.[8]

After discovery, all parties—Schmidt, the Judge Defen-

---

[8]In addition, the district court dismissed Schmidt's wrongful termination in violation of public policy claim, which we address in our concurrently filed memorandum disposition.

dants and Torre, and Contra Costa County—moved for summary judgment. The only remaining claims were Schmidt's First Amendment claim under the federal constitution and her free speech claim under the California Constitution. In February 2011, the district court granted summary judgment to the Judge Defendants and Torre on the First Amendment and free speech claims, because it concluded that "candidacy for political office does not amount to speech on a matter of public concern" and therefore is not protected speech. The district court also concluded that the Judge Defendants and Torre were protected by absolute legislative immunity, because "[t]he policy is legislative" and Schmidt failed to present evidence that she was terminated pursuant to an administrative decision to apply a forward-looking policy retroactively.[9]

Schmidt raises various issues on appeal, but here we only address Schmidt's challenge to the district court's grant of legislative immunity to the Judge Defendants.[10]

## III.

The district court initially granted the Judge Defendants legislative immunity "from all claims predicated on [their] involvement in promulgating the policy" in its December

[9]The district court also granted summary judgment to Contra Costa County on the § 1983 claims against it, and denied Schmidt's discovery request and related motions. We address Schmidt's appeals of those rulings in our concurrently filed memorandum disposition, along with her appeal of the dismissal of her wrongful termination claim against Torre.

[10]Although the district court granted Torre legislative immunity for his involvement in the adoption and application of the Policy, in fact legislative immunity is inappropriate for Torre because Schmidt sued him in his *official* capacity. *See Hirsch v. Justices of the Supreme Court of the State of Cal.*, 67 F.3d 708, 715 (9th Cir. 1995) (discussing legislative immunity for "individual defendants . . . in their individual capacities"). Moreover, it is clear from Schmidt's FAC and her briefs in this appeal that she included Torre in this suit only for purposes of her wrongful termination claim, discussed in our concurrently filed memorandum disposition.

2009 Rule 12(b)(6) dismissal order. In that order, the district court set forth its analysis of the legislative nature of the Policy, and in doing so, properly limited its discussion to the allegations contained in Schmidt's FAC. However, in its February 2011 order granting summary judgment to the Judge Defendants on Schmidt's remaining First Amendment and California free speech claims, the district court again determined that "[t]he policy is legislative," and again concluded that the Judge Defendants were entitled to absolute legislative immunity. Because the district court again addressed the issue of legislative immunity in its summary judgment ruling, we elect to address the issue of the Judge Defendants' entitlement to legislative immunity at the summary judgment stage, where we consider the evidence produced in response to the parties' summary judgment motions.

"This court reviews a district court's grant of summary judgment de novo." *Dawson v. Entek Int'l*, 630 F.3d 928, 934 (9th Cir. 2011). We "must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law." *Id.* Our task is not to " 'weigh the evidence or determine the truth of the matters asserted but . . . only [to] determine whether there is a genuine issue for trial.' " *Autery v. United States*, 424 F.3d 944, 956 (9th Cir. 2005) (quoting *Summers v. A. Teichert & Son, Inc.*, 127 F.3d 1150, 1152 (9th Cir. 1997)). We may affirm summary judgment "on any ground supported by the record." *Hawn v. Exec. Jet Mgmt., Inc.*, 615 F.3d 1151, 1155 (9th Cir. 2010). In addition, we review de novo the district court's decision to grant or deny legislative immunity. *San Pedro Hotel Co. v. City of Los Angeles*, 159 F.3d 470, 476 (9th Cir. 1998).

## IV.

**[1]** "Legislators are entitled to 'absolute common-law immunity against civil suits for their legislative acts, which is

parallel to the immunity provided by the Speech or Debate Clause.' " *Id.* at 476 (quoting *Chappell v. Robbins*, 73 F.3d 918, 920 (9th Cir. 1996)). Legislative immunity applies to actions for damages and for injunctive relief. *Supreme Court of Va. v. Consumers Union of the U.S., Inc.*, 446 U.S. 719, 732-33 (1980). We conclude that the Judge Defendants enjoy absolute legislative immunity for the adoption and application of the Policy, and we therefore affirm the district court's grant of summary judgment on that basis.

## A.  Authority to Regulate

**[2]** The threshold inquiry in our discussion of legislative immunity is whether the Superior Court has the authority to regulate the minimum qualifications of SJOs employed by the court, as the Executive Committee did when it adopted the Policy. In most legislative immunity cases, the governmental entity's authority to act is clearly defined and therefore rarely at issue. *See, e.g.*, *Cmty. House, Inc. v. City of Boise*, 623 F.3d 945, 960 (9th Cir. 2010) (noting the sections of the Idaho Code authorizing cities to pass ordinances and resolutions); *Kaahumanu v. Cnty. of Maui*, 315 F.3d 1215, 1222 (9th Cir. 2003) (noting that the Maui County Council has authority to grant conditional use permits). To merit legislative immunity, however, government officials must act within their defined or delegated legislative powers. The foundational case on legislative immunity, *Tenney v. Brandhove*, focuses specifically on whether officials "act[ed] in the sphere of *legitimate* legislative activity." 341 U.S. 367, 376 (1951) (emphasis added); *see also Rehberg v. Paulk*, 132 S. Ct. 1497, 1502 (2012); *Bogan v. Scott-Harris*, 523 U.S. 44, 54 (1998). When officials act outside their legitimate sphere of legislative authority—when they "acquire power by an unwarranted extension of privilege"—courts must not "hestitate[ ] to sustain the rights of private individuals" in the face of illegitimate legislative action. *Tenney*, 341 U.S. at 376, 377. Officials cross the line only when they violate the separation of powers and

"usurp[ ] . . . functions exclusively vested in the Judiciary or the Executive." *Id.* at 378.

**[3]** Here, the Superior Court's authority to adopt the Policy is not clear-cut. This is not because this case arises within the context of California's judicial branch, as it is well-settled that when judges perform legislative functions, they too may be entitled to legislative immunity.[11] *Supreme Court of Va.*, 446 U.S. at 734; *Hirsch v. Justices of the Supreme Court of the State of Cal.*, 67 F.3d 708, 715 (9th Cir. 1995). Rather, it is because a superior court's authority to regulate the qualifications of SJOs is not specifically enumerated in California law.

Article VI, Section 6 of the California Constitution establishes the Judicial Council of California and charges it with "adopt[ing] rules for court administration, practice and procedure," specifying that "[t]he rules adopted shall not be inconsistent with statute." CAL. CONST. art. VI, § 6(d). In turn, the Judicial Council adopted the California Rules of Court, which " 'have the force of statute to the extent that they are not inconsistent with legislative enactments and constitutional provisions.' " *Silverbrand v. Cnty. of Los Angeles*, 205 P.3d 1047, 1059 (Cal. 2009) (quoting *Sara M. v. Superior Court*,

---

[11]Contrary to Schmidt's argument, it is not necessary that a court exercise "the State's entire legislative power" in order to qualify for legislative immunity. *See Supreme Court of Va.*, 446 U.S. at 734. The Supreme Court of Virginia happened to do so when it promulgated and enforced rules prohibiting attorneys in the state from advertising their services, *id.*, but the *Supreme Court of Virginia* opinion does not hold that a court must act in place of the state legislature in order to qualify for legislative immunity. Our 1987 opinion in *Greater Los Angeles Council on Deafness v. Zolin* does not hold otherwise. *See* 812 F.2d 1103, 1108-09 (9th Cir. 1987). Although we referenced *Supreme Court of Virginia* in that opinion, we did not base our holding on the fact that the defendants, the Los Angeles County Superior Court's jury commissioner and director of juror services, did not exercise the entire legislative power of the state of California. *See id.* Instead, we held that the defendants made an executive decision because they "were [not] empowered by a legislative body to promulgate regulations to implement the legislative will." *Id.* at 1108.

116 P.3d 550, 556 (Cal. 2005)) (internal quotation marks omitted). The Judicial Council also has specific statutory authority to "promulgate rules establishing the minimum qualifications and training requirements for [SJOs]."[12] Cal. Gov't Code § 71622(c). The Superior Court's Policy established minimum qualifications for certain SJOs—temporary commissioners and temporary referees—more demanding than those set by the Judicial Council in the California Rules of Court. We must therefore determine whether the Superior Court may regulate SJOs in this way under California law.[13]

The California Rules of Court do authorize the Superior Court to adopt regulations establishing minimum qualifications for current and potential employees. We disagree with the district court and the Judge Defendants, however, that the Superior Court's authority to do so can be found in California Rule of Court 10.901(2), which provides that "[e]ach court must . . . [a]dopt for judges and court personnel an internal operations manual of policies and procedures necessary for the efficient operation and management of the court." The California courts have yet to interpret this Rule, but it does not appear to provide authority for the Superior Court to adopt minimum qualifications for SJOs. That this rule applies to

---

[12]Those minimum qualifications are that an SJO be a member of the California Bar and either (1) have "been admitted to practice law in California for at least 10 years or, on a finding of good cause by the presiding judge, for at least 5 years; or (2) [be] serving as a subordinate judicial officer in a trial court as of January 1, 2003." Cal. R. Ct. 10.701(b).

[13]We do not address whether the Superior Court has the authority to regulate temporary and pro tem judges, who are not SJOs. *See* Cal. R. Ct. 10.700(b), 10.701(a).

We also note that California courts have inherent authority to *appoint* SJOs. *People v. Laff*, 23 P.3d 563, 584 (Cal. 2001). The Legislature may "regulate the manner in which trial courts exercise this authority, so long as the Legislature does not defeat or materially impair the court's exercise of its constitutional power or the fulfillment of its constitutional functions." *Id.* The power to appoint SJOs is distinct from the power to regulate their qualifications, however.

*internal* operations manuals suggests that such manuals are meant to set forth the policies and procedures applicable to current employees of the Superior Court, not to potential employees.

Furthermore, there is no relevant authority in section 68070 of the Government Code, which both parties cite in their briefs. Section 68070 provides that "[e]very court may make rules for its own government and the government of its officers not inconsistent with law or with the rules adopted and prescribed by the Judicial Council." Cal. Gov't Code § 68070(a). In addition to this statutory authority, "the superior court has the inherent supervisory and administrative powers to enact its own rules so long as they do not conflict with statutes, case law or the California Rules of Court." *Ghaffarpour v. Superior Court*, 136 Cal. Rptr. 3d 544, 547 (Cal. Ct. App. 2012); *see also Elkins v. Superior Court*, 163 P.3d 160, 165-66 (Cal. 2007); *Rutherford v. Owens-Illinois, Inc.*, 941 P.2d 1203, 1213 (Cal. 1997). The California Supreme Court has concluded, however, that both this inherent authority and the statutory authority from section 68070(a) amount to nothing more than California courts' ability to "create their own rules of evidence and procedure," so long as those local rules do not conflict with statewide rules. *Elkins*, 163 P.3d at 166. The authority to adopt local rules of evidence and procedure is not expansive enough to encompass the authority to adopt the policy at issue here.

**[4]** Instead, the Superior Court's authority to adopt the Policy can be found in California Rules of Court 10.601(b)(3) and 10.670(c)(4). By adopting Rule 10.601(b)(3), the Judicial Council granted superior courts the authority to "[m]anage their personnel systems, including the adoption of personnel policies." Rule 10.670(c)(4) requires superior courts to adopt "personnel plans" that address "[r]ecruitment, selection, and promotion policies."[14] These two Rules grant the Superior

---

[14]The June version of the Policy references California Rule of Court 10.670(c)(4) (formerly Rule 6.603(c)(4)) as one of its sources of authority.

Court significant authority over its personnel policies, including policies that apply to potential or future employees, through use of the terms "recruitment" and "selection." Cal. R. Ct. 10.670(c). This authority encompasses the ability to adopt policies establishing the minimum qualifications for persons who seek employment with the Superior Court.

**[5]** Personnel plans adopted by the superior courts in California must be "consistent with applicable statutes, rules, and standards of judicial administration." Cal. R. Ct. 10.670(b). The Superior Court's Policy, which established qualifications to serve as an SJO that are more demanding than those set by the Judicial Council, is not inconsistent with the Judicial Council's statutory authority to "promulgate rules establishing the minimum qualifications and training requirements for [SJOs]." Cal. Gov't Code § 71622(c). The crux of the issue is the meaning of "minimum" in section 71622(c): Schmidt argues that minimum qualifications are, in a sense, also *maximum* qualifications—that is, just as states may not increase the minimum voting age above 18 years, superior courts in California may not add to the minimum state-wide requirements to serve as an SJO. The Judge Defendants, by contrast, read "minimum" as establishing a statewide baseline or floor that allows superior courts to add to the requirements for those who seek to serve as an SJO.

**[6]** Because the term "minimum" in section 71622(c) is undefined in California statutes or case law, we must determine its meaning. We "must give effect to the language of a statute if it is plain and unambiguous." *Golden W. Ref. Co. v. SunTrust Bank*, 538 F.3d 1233, 1238 (9th Cir. 2008); *see also In re W.B., Jr.*, 144 Cal. Rptr. 3d 843, 858 (Cal. 2012). The plain meaning of the adjective "minimum" is "least attainable or possible." Webster's Third New International Dictionary of the English Language (Unabridged) 1438 (1993). Further, *Black's Law Dictionary* defines "minimum" as "[o]f, relating to, or constituting the smallest acceptable or possible quantity in a given case." Black's Law Dictionary 1085 (9th ed. 2009).

Clearly, a "minimum" sets the lowest, "least," or "smallest" possible standard. The Judge Defendants' interpretation of the statute is consistent with this definition, while Schmidt's interpretation does not mirror the standard definition of the term. Applying the plain meaning of "minimum" to this statute, it is clear that the Judicial Council establishes a statewide floor for the necessary qualifications that an SJO must possess. This does not prevent a county superior court from adopting additional requirements.

**[7]** In adopting the Policy, the Superior Court, through its Executive Committee, exercised its authority under the California Rules of Court, and therefore acted within its legislative authority. In the language of *Tenney*, this was not an "unwarranted extension of privilege," but rather was "legitimate legislative activity." 341 U.S. at 376. Therefore, we conclude that California law does afford the Superior Court the authority to adopt a policy regulating the minimum qualifications for future and current SJOs, and therefore that the Judge Defendants are eligible for legislative immunity at the first step of the inquiry. We next turn to the federal test for legislative immunity.

## B.   Legislative Immunity Under Federal Law

**[8]** "[L]egislators are absolutely immune from liability under § 1983 for their legislative acts." *Kaahumanu*, 315 F.3d at 1219. We do not look to "defined categories of government acts but [to] 'the character and effect' of the particular act at issue" to determine if the act is legislative. *Cmty. House*, 623 F.3d at 960 (quoting *Cinevision Corp. v. City of Burbank*, 745 F.2d 560, 580 (9th Cir. 1984)). In particular, we consider four factors: "(1) whether the act involves ad hoc decisionmaking, or the formulation of policy; (2) whether the act applies to a few individuals, or to the public at large; (3) whether the act is formally legislative in character; and (4) whether it bears all the hallmarks of traditional legislation." *Kaahumanu*, 315 F.3d at 1220 (internal quotation marks omitted). "The first

two factors are largely related, as are the last two factors, and they are not mutually exclusive." *Cmty. House*, 623 F.3d at 960.

We emphasize that our "inquiry into whether the officials' actions were legislative must be 'stripped of all considerations of intent and motive.' " *Id.* (quoting *Bogan v. Scott-Harris*, 523 U.S. 44, 55 (1998)). In *Bogan*, the Supreme Court stated that "it simply is 'not consonant with our scheme of government for a court to inquire into the motives of legislators,' " 523 U.S. at 55 (quoting *Tenney*, 341 U.S. at 377), and noted that legislative immunity was granted in *Tenney* despite the accusation that the defendant "allegedly singled out the plaintiff for investigation in order 'to intimidate and silence plaintiff and deter and prevent him from effectively exercising his constitutional rights.' " *Id.* (quoting *Tenney*, 341 U.S. at 371). In *Bogan*, the city council and the mayor of Fall River, Massachusetts eliminated the Department of Health and Human Services, of which plaintiff Janet Scott-Harris was the sole permanent employee, shortly after Scott-Harris prepared termination charges against a politically well-connected temporary employee serving under her who had allegedly made repeated racial and ethnic slurs against her colleagues. *Id.* at 46-47. The Supreme Court nevertheless granted legislative immunity to the city council members and the mayor, concluding with "little trouble" that their acts of introducing, voting for, and signing the ordinance eliminating the department into law were "quintessentially legislative." *Id.* at 55. Keeping these precedential examples in mind, we move on to the *Kaahumanu* four-factor test.

### (1) Ad Hoc Decisionmaking or Formulation of Policy

**[9]** An ad hoc decision is one "taken based on the circumstances of [a] particular case"; it does not "effectuate policy or create a binding rule of conduct." *Kaahumanu*, 315 F.3d at 1220. "An 'ad hoc' decision is made 'with a particular end or purpose,' as distinguished from 'a coordinated policy.' "

*Cmty. House*, 623 F.3d at 961 (quoting Webster's New International Dictionary (Unabridged) 26 (2002)). The Superior Court's Policy is clearly not an ad hoc decision. Unlike the Maui City Council in *Kaahumanu*, the Superior Court was not considering an individual application for specific governmental action—in that case, the granting of a conditional use permit—but rather was creating a binding rule for all attorneys serving the Superior Court as temporary judges, commissioners, and referees. *See Kaahumanu*, 321 F.3d at 1220. This factor therefore supports finding that the Policy is legislative in character.

### (2) Application to a Few Individuals or to the Public at Large

"When the act in question applies to a few individuals rather than the public at large, legislative immunity is disfavored." *Id.* at 1222. However, "[a]n act need not affect a city's entire population in order to be considered legislative. It is sufficient that the act affects a discrete group of people or places." *Cmty. House*, 623 F.3d at 960. This factor is a "question . . . of degree," and while it " 'may at times be useful, it does not always provide an answer to the question' of whether an act is legislative." *Kaahumanu*, 315 F.3d at 1222 (quoting *Cinevision*, 745 F.2d at 579).

[10] Here, the Policy affected every temporary judge, temporary commissioner, and temporary referee appointed by the Superior Court after May 15, 2004, and all such future appointments. Although at the time of its adoption the Policy affected only two temporary commissioners and two private judges, the Policy was not limited to these four individuals but extended to all future applicants for such positions.[15]

---

[15]Schmidt cites *Gutierrez v. Municipal Court*, 838 F.2d 1031 (9th Cir. 1988), to argue that the Policy was a personnel decision and not the result of legislative judgment. The Supreme Court vacated *Gutierrez* as moot, and the opinion therefore holds no precedential value. 490 U.S. 1016

Therefore, this factor also supports finding that the Policy is legislative in character.

### (3) Formally Legislative Character of the Act

[11] The "formally legislative character" of an act—i.e., the fact that a decision was made by voting or through an equivalent legislative procedure—"weighs in favor of legislative immunity, [but] it does not itself decide the issue." *Id.* at 1223. The act of voting on and passing ordinances and resolutions pursuant to correct legislative procedures is "formally and indisputably legislative."[16] *Cmty. House*, 623 F.3d at 960. Here, the Executive Committee discussed and then "moved, seconded, and unanimously APPROVED" the Policy at the Committee's May 19, 2004 meeting. The meeting itself appears to have been a formal one, in that there was an agenda, minutes were taken and later approved, and certain formal procedures were followed, including making motions and seconding those motions before voting on them. The Policy itself was approved unanimously, which indicates that a vote took place. Therefore, the act of approving the Policy was legislative in character, and this factor too weighs in favor of legislative immunity.

---

(1989); *see also Garcia v. Spun Steak Co.*, 998 F.2d 1480, 1487 n.1 (9th Cir. 1993). Even if the reasoning of *Gutierrez* were still binding, however, the case is distinguishable because it involved an intra-workplace English-only "rule governing the conduct of clerical employees" in a specific municipal court. Here, by contrast, the Policy did not affect conduct within the workplace but rather established the minimum qualifications to serve the court in certain judicial-type positions, and therefore had a much wider application.

[16]Schmidt's argument that the Policy was not adopted consistent with the Superior Court's Local Court Rule 4 appeared only in her reply brief, and is therefore waived. *See Miller*, 797 F.2d at 738; *Kimble*, 107 F.3d at 715 n.2.

*(4) Hallmarks of Traditional Legislation*

The hallmarks of traditional legislation include the use of discretion, the making of policy that implicates budgetary priorities and the provision of services, and prospective implications that reach beyond the particular persons immediately impacted. *See Kaahumanu*, 315 F.3d at 1223. Adoption of the Policy was certainly a discretionary act; there is nothing in the summary judgment record, governing statutes or court rules that directed the Superior Court to adopt this particular policy.

**[12]** The Policy also implicates the provision of services to litigants and the public. First, because the Policy set the qualifications of those who would be allowed to serve the Superior Court in a subordinate judicial capacity, it had a direct impact on litigants. Second, to the extent that certain temporary commissioners and referees then employed by the Superior Court, like Schmidt, were rendered ineligible to serve, and that other potential future applicants were similarly rendered ineligible to apply for those positions for a certain number of years, the Policy restricted the potential applicant pool for such positions. The diminished candidate pool had the potential to affect the Superior Court's ability to recruit qualified temporary commissioners and referees to meet its needs. Finally, the Policy had prospective implications reaching beyond the particular temporary commissioners and private judges immediately affected in May 2004, because it applied to all future applicants for the positions as well. Similar to the Fall River City Council's decision to eliminate the Department of Health and Human Services in *Bogan*, the Policy was not "the hiring or firing of a particular employee" but a decision to alter the eligibility requirements for everyone wishing to serve in certain temporary bench officer positions in the Superior Court. *Bogan*, 523 U.S. at 56. Therefore, the Policy bore the hallmarks of traditional legislation, and this final factor also supports finding that the Policy was legislative in character.

**[13]** All four *Kaahumanu* factors support our determination that the Policy adopted by the Superior Court's Executive

Committee in May 2004 was legislative. Furthermore, the district court correctly rejected Schmidt's argument that the Judge Defendants were liable for applying the Policy to her: the Policy was a legitimate legislative act, and was not applied to Schmidt until May 20 at the earliest, one day after it was unanimously adopted by the Executive Committee. We therefore conclude that the Judge Defendants are entitled to legislative immunity for their role in adopting and applying the Policy. The district court correctly granted summary judgment to the Judge Defendants for Schmidt's First Amendment claim under section 1983.

## C.  Legislative Immunity Under California Law

**[14]**  The Judge Defendants also enjoy legislative immunity from Schmidt's California Constitution claims. In its initial order dismissing most of Schmidt's claims, the district court concluded that the Judge Defendants enjoyed legislative immunity from "all claims predicated on [their] involvement in promulgating the policy," which applied both to Schmidt's federal First Amendment claim and to her California free speech claim, although the district court provided no separate discussion of California legislative immunity. Neither did the district court discuss California legislative immunity in its February 2011 summary judgment order. We conclude, however, that the Judge Defendants do enjoy legislative immunity from Schmidt's California Constitution claims under California law.

**[15]**  Legislative immunity in California law is grounded in the separation of powers doctrine, embodied in Article III, Section 3 of the California Constitution: "The powers of state government are legislative, executive, and judicial. Persons charged with the exercise of one power may not exercise either of the others except as permitted by this Constitution."[17]

[17]The Judge Defendants argued to the district court that they were entitled to legislative immunity pursuant to the California Tort Claims Act,

*See D'Amato v. Superior Court*, 84 Cal. Rptr. 3d 497, 505-07 (Cal. Ct. App. 2008); *Steiner v. Superior Court*, 58 Cal. Rptr. 2d 668, 676-78 (Cal. Ct. App. 1996). A "corollary of the separation of powers doctrine . . . is legislators have absolute immunity from damage suits based on legislative acts." *Steiner*, 58 Cal. Rptr. 2d at 677. To determine whether a governmental action qualifies as "legislative," the California courts focus on whether governmental actions "contain matter which is properly to be regarded as legislative in character and effect." *Id.* at 679 (quoting *Cinevision*, 745 F.2d at 580). Our lengthy discussion of the Policy under the *Kaahumanu* framework establishes that it was "legislative in character and effect" for the reasons given *supra*, in particular that the Executive Committee formulated a policy that applied not just to Schmidt but to all temporary judges, commissioners, and referees, and to everyone looking to apply to serve in one of those capacities.

## V.

**[16]** Because Defendants Brady, Haight, Maddock, and Baskin are entitled to legislative immunity from Schmidt's section 1983 and California Constitution claims for their role in adopting and applying the Policy to Schmidt, we affirm the district court's grant of summary judgment to the Judge Defendants. This conclusion forecloses any relief on Schmidt's free speech claims, and also on her other section 1983 claims for the violation of her rights under the Takings Clause of the Fifth Amendment and the Bill of Attainder Clause of the United States Constitution, and their equivalents under the

which provides that "[e]xcept as otherwise provided by statute, a public employee is not liable for an injury resulting from his act or omission where the act or omission was the result of the exercise of the discretion vested in him, whether or not such discretion be abused." Cal. Gov't Code § 820.2. However, the immunities set forth in the Tort Claims Act do not apply to claims, like Schmidt's free speech claim, which are based upon alleged violations of the California Constitution. *See Odello Bros. v. Cnty. of Monterey*, 73 Cal. Rptr. 2d 903, 912 (Cal. Ct. App. 1998).

California Constitution, to the extent that these additional claims are based on the Judge Defendants' adoption of the Policy.[18] Although the timing of the Policy and its targeted effect on Schmidt certainly call the Defendants' motives into question, it is not for the courts to determine whether legislators had "dishonest or vindictive motives" when they passed a specific piece of legislation. *Tenney*, 341 U.S. at 378. Instead, we are limited to "the narrow confines of determining that a [governmental act] may fairly be deemed within its province." *Id.* Here, the Executive Committee of the Superior Court was "within its province" when it promulgated the Policy, and therefore we can comment no further.

   **AFFIRMED.**

---

[18]To the extent that these additional claims are free-standing due process and bill of attainder claims under the federal and state constitutions, we affirm the district court's dismissal of these claims on the merits. First, the district court correctly dismissed Schmidt's claim that application of the temporary judges policy constituted an unconstitutional taking of her property without due process. The district court correctly concluded that Schmidt failed to plead sufficient factual allegations in her FAC to permit a reasonable inference that she had a legitimate claim of entitlement to continued employment as a temporary court commissioner. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Gerhart v. Lake Cnty., Mont.*, 637 F.3d 1013, 1019 (9th Cir. 2011).

   Second, the district court correctly dismissed Schmidt's claim that the temporary judges policy was an unconstitutional bill of attainder, because she alleges no facts in her FAC that would allow the inference that the policy was punitive. *See Iqbal*, 556 U.S. at 678; *United States v. Lujan*, 504 F.3d 1003, 1006 (9th Cir. 2007).