Filed 7/28/21

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| GLENN MAHLER et al., <br><br>    Plaintiffs and Appellants, <br> v. <br> JUDICIAL COUNCIL OF CALIFORNIA et al., <br><br>    Defendants and Respondents. | A158696 <br><br> (San Francisco City & County Super. Ct. No. CGC19575842) |

**INTRODUCTION**

Plaintiffs, retired superior court judges who have participated in the Temporary Assigned Judges Program (TAJP), challenge recent changes to the program made by the Chief Justice. These changes include limits on the duration of service in the program but provide for some exceptions. Plaintiffs claim these changes discriminate against "older" retired judges and have filed the instant lawsuit, alleging disparate impact age discrimination under the Fair Employment and Housing Act (FEHA). The trial court sustained defendants' demurrer without leave to amend on the ground legislative immunity bars the suit.

Legislative immunity does, indeed, shield the Chief Justice and the Judicial Council from suit, regardless of the nature of the relief sought, to the extent plaintiffs' discrimination claim is based on the Chief Justice's promulgation of changes to the TAJP. Legislative immunity does not, however, foreclose suit to the extent plaintiffs' claim is based on defendants'

1

enforcement of the challenged provisions of the TAJP through individual judicial assignments. Rather, judicial immunity applies to the Chief Justice's assignment of individual judges in accordance with the new TAJP provisions, and while judicial immunity forecloses monetary relief, it does not foreclose prospective declaratory relief.

Defendants also demurred on the ground plaintiffs' allegations fail to state a viable disparate impact age discrimination claim. Although the trial court did not consider the sufficiency of the complaint, defendants press this as an alternative ground to affirm, and we therefore address the issue, given our conclusion that legislative immunity does not wholly bar plaintiffs' suit. We agree that plaintiffs' allegations are, at present, insufficient.

We do not agree, however, that plaintiffs must be denied leave to amend. In so concluding, we disagree with defendants that a disparate impact age discrimination claim cannot, as matter of law, be based on disparate impact on an older subgroup within the class of persons protected under the FEHA, namely employees forty years of age and older. No California court has squarely addressed this issue, and while several federal circuit courts have held "sub-class" disparate impact age discrimination claims are not viable under the Age Discrimination in Employment Act (ADEA), the majority view is now to the contrary. We find the reasoning of these recent cases more persuasive than that of the older cases and conclude it is in keeping with our Legislature's stated intent that the FEHA age discrimination provisions be liberally construed to achieve its salutary purposes.

We therefore reverse the dismissal order and remand to allow plaintiffs an opportunity to amend. In doing so, we are expressing no opinion as to

2

whether further amendment will sufficiently state a disparate impact age discrimination claim or as to the merits of plaintiffs' claim.

## BACKGROUND

### *The Temporary Assigned Judges Program*

The TAJP has its roots in the original Judges' Retirement Act, Stats. 1937, page 2204. (*Pickens v. Johnson* (1954) 42 Cal.2d 399, 402 (*Pickens*).) By 1951, section 6 of the Judges' Retirement Act, provided that: " 'Justices and judges retired under the provisions of this act, so long as they are entitled by its provisions to receive a retirement allowance, shall be judicial officers of the State, but shall not exercise any of the powers of a justice or judge except while under assignment to a court as hereinafter provided. Any such retired justice or judge may, with his own consent, be assigned by the Chairman of the Judicial Council to sit in a court of like jurisdiction as, or higher jurisdiction than, that court from which he was retired; and while so assigned shall have all the powers of a justice or judge thereof. If assigned to sit in a court, he shall be paid while sitting therein in addition to his retirement allowances the difference, if any, between his retirement allowance and the compensation of a judge of the court to which he is assigned.' "[1] (*Pickens*, at p. 402, quoting Judges' Retirement Act, Stats. 1951, p. 3694.)

As our Supreme Court explained in *Pickens* in upholding the validity of retired judge assignments against a variety of constitutional challenges, "[w]hether as a matter of policy the system of assignment of retired judges should be put into effect is for the people of the state to determine through

_____

[1] As we discuss *infra*, the Chief Justice's appointment authority is now set forth in article VI, section 6, subdivision (e) of the California Constitution. The compensation and reimbursement of retired judges sitting on assignment is now set forth in Government Code section 68543.5.

3

the Constitution or by the Legislature." (*Pickens, supra,* 42 Cal.2d at p. 409.) "That policy has been declared by both, by the Constitution by reasonable implication and by the Legislature in the unmistakable and definite terms of section 6 of the retirement act." (*Ibid*.) The purposes of such provision are, moreover, wholly beneficial to the state, making "available to the judicial department the experience, aptitude and capabilities of retired judges who, with their consent, may be called upon for assistance in the administration of justice." (*Id.* at p. 410.) Utilization of retired judges "is highly desirable not only in particular cases but also when congestion in judicial business in a particular locality has become critical, and oftentimes intolerable." (*Ibid*.)

The high court went on to explain that "[t]he chairman of the Judicial Council"—the Chief Justice—"is the logical constitutional officer in whom to vest the power of assignment. It is one of his [or her] functions to marshal the judicial manpower of the state by assignment and transfer of judges to facilitate the dispatch of judicial business. No other person is in better or as good a position as he [or she] to determine the desirability and need for such assistance." (*Pickens, supra,* 42 Cal.2d at p. 410.) Indeed, "[b]y section 1a of article VI (subd. 6) of the Constitution the duty is enjoined upon the chairman of the Judicial Council to seek to expedite the judicial business of the state, to equalize the work of the judges, and to provide for the assignment of incumbent judges from one county to another under certain conditions." (*Pickens,* at p. 409.)

Two decades later, in *Mosk v. Superior Court* (1979) 25 Cal.3d 474 (*Mosk*)[2], our Supreme Court reaffirmed the broad assignment authority of the Chief Justice, upholding the validity of a Supreme Court comprised entirely

---

[2] Superseded by statute on other grounds as stated in *Adams v. Commission on Judicial Performance* (1994) 8 Cal.4th 630, 650.

of appointed Court of Appeal justices on the recusal of the sitting justices. Justice Mosk, who was challenging the issuance of a subpoena by the Commission on Judicial Performance, claimed as a threshold matter, that the high court, so constituted, had no constitutional authority to act. (*Id*. at pp. 479-480.)

The Supreme Court reiterated that "[t]he Chief Justice has long had constitutional authority to assign any lower court judge, who is otherwise qualified, to the Supreme Court to sit in place of a disqualified Supreme Court justice. The 1926 constitutional amendment which created the Judicial Council (Cal. Const., art. VI, § 1a, now § 6) provided that the Chief Justice, as chairman of the Judicial Council, 'shall seek to expedite judicial business and to equalize the work of the judges, and shall provide for the assignment of any judge to another court of a like or higher jurisdiction to assist a court or judge whose calendar is congested, to act for a judge who is disqualified or unable to act, or to sit and hold court where a vacancy in the office of judge has occurred.' As amended in 1966 and 1974, this provision now reads: 'The Chief Justice shall seek to expedite judicial business and to equalize the work of judges. The Chief Justice may provide for the assignment of any judge to another court but only with the judge's consent if the court is of lower jurisdiction. A retired judge who consents may be assigned to any court.' (Cal. Const., art. VI, § 6, par. 5th.)" (*Mosk, supra,* 25 Cal.3d at p. 481.)

Thus, "[t]he Constitution gives the Chief Justice broad authority to expedite the work of the courts [citation], and implicit in that authority is the Chief Justice's power to assign judges to assist the Supreme Court when regular Supreme Court justices are disqualified. Such assignments have become commonplace." (*Mosk, supra,* 25 Cal.3d at pp. 481-482.) It is further implicit,

5

since "[t]here is no constitutional provision, statute, or court rule which prescribes the manner in which assigned judges are to be selected,"[3] that the "manner, method, or criteria for selection of duly qualified assigned judges is within the inherent power of the Supreme Court and within the discretion of the Chief Justice in the exercise of her constitutional authority to make the assignments." (*Mosk,* at pp. 482-483.)

The Court of Appeal brought these principles to bear some twenty years later in *People v. Superior Court* (*Mudge*) (1997) 54 Cal.App.4th 407 (*Mudge*), in examining the retired judges program and invalidating a statute that allowed the parties in a criminal case to stipulate that an assigned retired judge was " 'not capable or qualified to hear and retry the criminal case.' " (*Id.* at p. 410.) The statute could not, said the court, "be reconciled with the Chief Justice's implied factual determination that the assigned retired judge" was capable and qualified to sit as a judge. (*Ibid.*)

The appellate court focused on the separation of powers spelled out in article III, section 3, of the California Constitution and the associated provisions set forth in article VI, section 6, which "expressly grants the Chief Justice the constitutional power to administer the assignment of judges."[4] (*Mudge, supra,* 54 Cal.App.4th at pp. 411-412.) Pursuant to these provisions,

_____

[3] There is one exception—article VI, section 18, subdivision (e), which specifies the composition of a tribunal considering a recommendation by the Commission on Judicial Performance on a sitting Supreme Court justice— which was not applicable in *Mosk* (*Mosk, supra,* 25 Cal.3d at p. 482) and is not applicable here.

[4] California Constitution article VI, section 6, subdivision (e) then provided and still provides: "The Chief Justice shall seek to expedite judicial business and to equalize the work of judges. The Chief Justice may provide for the assignment of any judge to another court but only with the judge's consent if the court is of lower jurisdiction. A retired judge who consents may be assigned to any court."

" '[t]he manner, method, or criteria for selection of duly qualified assigned judges is within the inherent power of the Supreme Court and within the discretion of the Chief Justice in the exercise of her [or his] constitutional authority to make the assignments.' (*Mosk*[, *supra,*] 25 Cal.3d [at p.] 483 . . . , fn. omitted; see also *People v. Ferguson* (1932) 124 Cal.App. 221, 231 . . . [Chief Justice has 'discretion of the broadest character' in the assignment of judges].)" (*Mudge, supra,* 54 Cal.App.4th at p. 412.)

Indeed, in response to an argument that retired judges were not as likely to stay abreast of developments in criminal law as sitting judges, the appellate court pointed out "the Chief Justice had recently promulgated 'standards and guidelines for judges serving on assignment.' These standards and guidelines discuss eligibility to sit on assignment, continuing judicial education requirements, and provide for a signed agreement that the assigned retired judge '. . . will maintain familiarity with current statutes, case law, court rules, court procedures, and comply with the continuing education requirements. . . .' (Retired Judge Application to Serve on Assignment.)" (*Mudge, supra,* 54 Cal.App.4th at p. 414.)

The challenged statute, however, enabled the parties to effectively "veto the Chief Justice's constitutional assignment," thus "substantially impair[ing]" the "Chief Justice's constitutional power." (*Mudge, supra,* 54 Cal.App.4th at p. 412.)

The court acknowledged that " '[t]he Legislature may adopt reasonable rules and regulations regarding the disqualification of judges [citation].' " (*Mudge, supra,* 54 Cal.App.4th at p. 412.) But only "as long as it does not defeat or materially impair the judicial function. [Citation.] Phrased otherwise, our Supreme Court has said that any legislative regulation must not 'substantially impair' an express provision of the California Constitution."

(*Ibid.,* quoting *Sacramento Etc. D. Dist. v. Superior Court* (1925) 196 Cal. 414, 432.)  The appellate court thus commented that "[b]efore enacting [the challenged statute], the Legislature should have explored the question posed by its staff on the Senate Committee on Criminal Procedure:  'Will this interfere with the Chief Justice's constitutional right to assign a retired judge to any court?'  (Sen. Com. on Criminal Procedure, Analysis of Assem. Bill No. 1736 (1995–1996 Reg. Sess.) June 6, 1995, p. 5.)"  (*Mudge,* at p. 413.)

As was alluded to in *Mudge*, the Judicial Council adopted the TAJP in 1996 to provide administrative support to the Chief Justice in the exercise of her constitutional authority to assign and reassign judges, including retired judges.  "The Judicial Council is a state entity established by the California Constitution to 'improve the administration of justice'  and set policies and priorities for the judicial branch of government.  The Council is chaired by the Chief Justice of California.  Article VI, section 6(e) of the California Constitution directs that:  The Chief Justice shall seek to expedite judicial business and to equalize the work of judges."  (96 Ops.Cal.Atty.Gen. 36-37 (July 25, 2013), fns. omitted.)

"The Assigned Judges Program (AJP) is administered by the Administrative Office of the Courts (AOC), which is the staff agency of the Judicial Council.  Assisted by the AJP, and pursuant to the constitutional mandate of Article VI, section 6(e), the Chief Justice issues temporary judicial assignment orders to active or retired judges and justices in response to a variety of circumstances, including vacancies, illnesses, disqualifications, and calendar congestion in the courts."  (96 Ops.Cal.Atty.Gen., *supra*, at p. 37, fns. omitted.)  "Judicial precedent has established that the Chief Justice, as Chair of the Judicial Council, is invested with 'discretion of the broadest character' in the assignment of judges.  As our Supreme Court has stated:  'The manner,

8

method, or criteria for selection of duly qualified assigned judges is . . . within the discretion of the Chief Justice in the exercise of her constitutional authority to make the assignments.' It is 'a well-settled rule of law that where there are no restrictive provisions the power of appointment carries with it the power of removal.' Accordingly, the Chief Justice's discretion in the making of judicial assignments generally encompasses both the non-renewal and the termination of such assignments." (*Id.* at p. 43, fns. omitted.)

In 2017, concerns about the TAJP were brought to the attention of the Chief Justice,[5] who directed Judicial Council staff to conduct an internal review.[6] At the same time, the State Auditor initiated a review of the TAJP in response to concerns that retired judges were being assigned to courts with judicial "surpluses."

As a result of the internal review, the Chief Justice made a number of changes to the TAJP, including:

> **Bona Fide Break in Service**: There is now a 90-day waiting period after retirement before a retired judge can participate.

> **1,320-Day Service Limit**: Participation is now limited to 1,320 days, cumulatively (the equivalent of a single term of a full-time elected superior court judge).

---

[5] Some of these concerns, including overlong assignments, appear to have precipitated the request for the Attorney General Opinion from which we have just quoted.

[6] We grant respondents' request for judicial notice and refer here to some of the noticed materials, which were also before the trial court, and which include: the Judicial Council's Temporary Assigned Judges Program Handbook (June 2019), the State Auditor's report investigating activities of state agencies and employees, and a memorandum issued by the Administrative Director of the Judicial Council discussing the changes made to the TAJP (dated May 21, 2018). (See Evid. Code, §§ 452, subd. (c), 459.)

**120-Day Service Limit Per Year:** Participation per fiscal year is limited to 120 days.

**Resource Allocation:** Courts now receive an initial allocation of additional judicial resources, representing a floor of prospective service days. Requests for service above that floor are evaluated on a case-by-case basis, upon a showing of demonstrable need.

**Exceptions:** The 90-, 120-, and 1,320-day service limitations can be adjusted if a superior court seeking TAJP assistance shows, among other things, the absence of other available retired judges or if there is a strong need for a specific retired judge. Accordingly, retired judges who reach the 1,320-day service limit can continue to enroll in TAJP and may be assigned to a superior court submitting an exception report that demonstrates "why it is both prudent and necessary to reappoint the judge specifically requested by the court."

These changes to the TAJP were announced in May 2018, and became effective on July 1, 2018, after having been reviewed by the Judicial Council's Trial Court Presiding Judges Committee, the Court Executives Advisory Committee, and the Administrative Presiding Justices Advisory Committee. Before adoption, Judicial Council staff, on behalf of the Chief Justice, conducted more than 50 transition meetings and conference calls with individual presiding judges and court executive officers.

The State Auditor was notified of these changes to the TAJP, and ultimately reported that "[b]y modifying the process to establish metrics for judicial participation and changing how it allocates service days and funds in the AJP, the Judicial Council has taken steps to administer the AJP in a more efficient manner."

10

***The First Amended Complaint***[7]

Plaintiffs are retired judges who have long participated in the TAJP and who, at the time of the 2018 changes to the program, had already served more than 1,320 days as assigned temporary judges. Plaintiffs do not claim that they have been denied any appointments, but that the changes, and the 1,320-day service limit, in particular, subjects them to "different" conditions than "younger judges." Specifically, they maintain the "policy of arbitrarily limiting assigned judges to 1,320 days of service" has a "disparate impact" on them "and other persons of their age" because they will "no longer be given assignments unless they receive an 'exception' to the policy."

Plaintiffs named as defendants the Chief Justice in her "official capacity as Chair of the Judicial Council" and the Judicial Council. They alleged two causes of action—disparate impact age discrimination in violation of the FEHA and violation of the state constitution. Plaintiffs have acknowledged their second cause of action has no independent vitality and stands or falls with their first. They initially sought "back pay, front pay, and other monetary relief," as well as declaratory and injunctive relief, but subsequently abandoned any "damages claims against the Chief Justice."

***Denial of Preliminary Injunctive Relief***

Plaintiffs moved for a preliminary injunction to enjoin retroactive application of the 1,320-day service limit, supporting their motion with a number of declarations.

Defendants filed opposition, which included counter-declarations and exhibits. Defendants maintained plaintiffs were unlikely to prevail, and

---

[7] We provide only a brief overview of the procedural history here and discuss the plaintiffs' allegations in more detail in connection with our substantive discussion of the issues on appeal.

11

therefore preliminary relief should be denied, for two reasons—because suit is barred by legislative immunity and because plaintiffs cannot state a viable claim for disparate impact age discrimination under the FEHA.

The trial court denied relief on both grounds. The court first ruled the changes to the TAJP were "an act of rulemaking expressly grounded in the Judicial Council's and the Chief Justice's constitutional authority which has all the hallmarks of a legislative action: detailed policy analysis, use of discretion, implication of budgetary priorities, and prospective application." Secondly, as to the sufficiency of plaintiffs' allegations, the court ruled, "experience may but does not necessarily correlate with age, because age and work experience are analytically different" and respondents' evidence " 'convincingly show[ed]' " that "whether a given retired judge has already reached the 1,320 limit does not correlate to his or her age or even to the number of years he or she has served" in the program.

### *Demurrer and Dismissal*

Defendants subsequently demurred to the first amended complaint, asserting that the suit was barred by legislative immunity and, alternatively, that plaintiffs failed to allege a prima facie case of disparate impact age discrimination under the FEHA.

In their opposition, plaintiffs acknowledged they had already fully briefed the issue of legislative immunity in connection with their motion for a preliminary injunction and the trial court had ruled against them on that issue. While they continued to believe legislative immunity did not apply, they stated that "[s]hould the Court adhere to its previous ruling," there was no need for the court to consider defendants' other contentions. Plaintiffs therefore devoted their written opposition to defending their FEHA claim,

12

including representing they could allege additional facts that would cure any perceived shortcoming in their allegations of a prima facie case.

In reply, defendants urged the court to reach the FEHA pleading issue and further maintained plaintiffs had not offered any amendment that could cure the deficiencies of their allegations.

The court sustained the demurrer without leave to amend solely on the ground of legislative immunity, referring to its prior ruling denying preliminary injunctive relief. It additionally observed plaintiffs had "conced[ed]" they could not recover damages for the Chief's Justice's "discretionary acts in administering" the TAJP, citing Government Code section 820.2 (which protects public employees from damages claims for discretionary acts) and *Caldwell v. Montoya* (1995) 10 Cal.4th 972 (*Caldwell*) (which holds discretionary immunity extends to damages claims under the FEHA). This concession, said the court, provided "further support" for its conclusion that plaintiffs' suit is barred by legislative immunity.

## DISCUSSION

### *Immunity from Suit*[8]

#### *Promulgation of New TAJP Requirements*

In concluding the instant lawsuit is barred by legislative immunity, the trial court placed considerable reliance on *Schmidt v. Contra Costa County*

---

[8] Whether immunity forecloses suit is properly raised by demurrer and our review of the ensuing judgment of dismissal is de novo. (See, e.g., *Caldwell, supra,* 10 Cal.4th at p. 978 [appeal from judgment of dismissal following sustaining of demurrer; concluding as a matter of law that discretionary immunity barred plaintiff's FEHA claims against individual school board members]; *Esparza v. County of Los Angeles* (2014) 224 Cal.App.4th 452, 455, 459 (*Esparza*) [same; concluding as a matter of law that legislative immunity barred plaintiff's FEHA claims against board of supervisors]; *People ex rel. Harris v. Rizzo* (2013) 214 Cal.App.4th 921, 928-

13

(9th Cir. 2012) 693 F.3d 1122 (*Schmidt*). We agree *Schmidt* is of significant import.

In *Schmidt*, the plaintiff sued a number of individual superior court judges and the court's executive officer, in both their individual and official capacities, based on the court's adoption of changes to its subordinate judicial officer (SJO) policy and, specifically, changes to the qualifications for service as such. (*Schmidt, supra,* 693 F.3d at pp. 1129-1130.) As a result, the plaintiff was no longer eligible to serve as a temporary court commissioner. She sued, claiming the changes were made in retaliation for having challenged a sitting judge running for reelection. (*Id.* at pp. 1126-1127.)

Several rounds of challenges to the pleadings followed, with the district court eventually dismissing claims based on the promulgation of the new SJO policy on the ground of legislative immunity. (*Schmidt, supra,* 693 F.3d at pp. 1130-1131.) The court denied the dismissal motions, however, as to claims based on the "retroactive" application of the new policy. (*Id.* at p. 1131.) After discovery, the defendants moved for summary judgment on these remaining claims, including on the ground of legislative immunity. (*Ibid.*) The district court granted the motion on several grounds. (*Ibid.*) The Ninth Circuit affirmed solely on the ground of legislative immunity. (*Id.* at p. 1127.)

After stating generally that, as a matter of federal law, " '[l]egislators are entitled to "absolute common-law immunity against civil suits for their legislative acts, which is parallel to the immunity provided by the Speech or Debate Clause" ' " and that such "immunity applies to actions for damages and for injunctive relief," the circuit court turned to the first issue relevant to

929 (*Rizzo*) [same; concluding as a matter of law that legislative immunity barred claims based on non-ultra vires actions by city council].)

14

determining whether a defendant is entitled to legislative immunity—whether the defendant acted within its "delegated legislative powers." (*Schmidt, supra,* 693 F.3d at p. 1132.)

The superior court's authority to adopt the new SJO policy, said the circuit court, was "not clear-cut" given that such authority is "not specifically enumerated in California law," in contrast to the Judicial Council's "specific statutory authority to 'promulgate rules establishing the minimum qualifications and training requirements for [SJOs].' " (*Schmidt, supra,* 693 F.3d at p. 1133, quoting Gov. Code, § 71622, subd. (c).) The court went on to conclude, however, that the superior court had such authority by virtue of the California Rules of Court authorizing superior courts to adopt personnel policies, and to further conclude this authority extended to requiring qualifications for SJOs more demanding than the minimum qualifications established by the Judicial Council. (*Schmidt,* at pp. 1134-1135.) Accordingly, in making changes to its SJO policy, the superior court had, indeed, "acted within its legislative authority." (*Id.* at p. 1135.)

The circuit court then turned to whether the superior court's challenged action was "legislative" in character, and in this regard, considered the four factors federal courts have identified as bearing on the issue: " '(1) whether the act involves ad hoc decisionmaking, or the formulation of policy; (2) whether the act applies to a few individuals, or to the public at large; (3) whether the act is formally legislative in character; and (4) whether it bears all the hallmarks of traditional legislation.' " (*Schmidt, supra,* 693 F.3d at p. 1135, quoting *Kaahumanu v. County of Maui* (9th Cir. 2003) 315 F.3d 1215, 1220.) The court also pointed out that in making this inquiry, " 'the of-

15

ficials' actions . . . must be "stripped of all considerations of intent and motive." ' " (*Schmidt,* at p. 1136, quoting *Bogan v. Scott–Harris* (1998) 523 U.S. 44, 55 (*Bogan*).[9])

The circuit court readily concluded the challenged revision to the superior court's SJO policy was legislative in character. It "clearly [was] not an ad hoc decision," as the court was not acting on "an individual application," but "was creating a binding rule for all attorneys serving" as temporary judges, commissioners, and referees. (*Schmidt, supra,* 693 F.3d at p. 1136.) Nor did the policy apply to only a few individuals, but "affected every temporary judge, temporary commissioner, and temporary referee" appointed after a specific date and into the future. (*Ibid.*) And while it did, indeed, apply to the four individuals then serving as pro tem judges and commissioners, it also extended "to all future applications for such positions." (*Id.* at pp. 1136-1137.)

The revision to the policy was also " 'formally' " legislative in character, as the court's executive committee had discussed the changes and adopted them by a vote. (*Schmidt, supra,* 693 F.3d at p. 1137.) The action additionally had the "hallmarks of traditional legislation," which include "the use of discretion, the making of policy that implicates budgetary priorities and the

---

9 In *Bogan,* a city council and mayor eliminated the city's department of health and human services, "of which [the] plaintiff . . . was the sole permanent employee, shortly after [she] prepared termination charges against a politically well-connected temporary employee serving under her who had allegedly made repeated racial and ethnic slurs against her colleagues." (*Schmidt, supra,* 693 F.3d at p. 1136.) Despite the gravity of the allegations, the United States Supreme Court "nevertheless granted legislative immunity to the city council members and the mayor," concluding with " 'little trouble' that their acts of introducing, voting for, and signing the ordinance eliminating the department into law, were 'quintessentially legislative.' " (*Ibid.,* quoting *Bogan, supra,* 523 U.S. at p. 55.)

provision of services, and prospective implications that reach beyond the particular persons immediately impacted." (*Ibid.*) Adoption of the changes to the court's SJO policy "was certainly a discretionary act." (*Ibid.*) It also implicated the provision of court services, as setting "the qualifications of those who would be allowed to serve" as a SJO "had a direct impact on litigants." (*Ibid.*) It additionally "had prospective implications reaching beyond the particular temporary commissioners and private judges immediately affected"— it applied to "everyone wishing to serve in certain temporary bench officer positions" in the court.[10] (*Id.* at pp. 1137-1138.)

Because the plaintiff had pursued state constitutional claims as well, the circuit court next turned to legislative immunity as defined and applied under California law. As the court observed, the doctrine's state law roots are "grounded in the separation of powers doctrine, embodied in Article III, Section 3 of the California Constitution: 'The powers of state government are legislative, executive, and judicial. Persons charged with the exercise of one power may not exercise either of the others except as permitted by this Constitution.' *See D'Amato v. Superior Court* [(2008)] 167 Cal.App.4th 861 . . . [(*D'Amato*)]; *Steiner v. Superior Court* [(1996)] 50 Cal.App.4th 1771 . . . [(*Steiner*)]. A 'corollary of the separation of powers doctrine . . . is legislators have

_____

[10] Thus, the adoption of the changes to the court's SJO policy was not, explained the court, merely an administrative action such as a single "personnel decision"—actions the federal courts have held are not legislative in character. (*Schmidt, supra,* 693 F.3d at p. 1137, fn. 15; see, e.g., *Forrester v. White* (1988) 484 U.S. 219, 220-221 [judge's allegedly discriminatory dismissal of female probation officer was not legislative act and judge was not entitled to legislative immunity from suit], superseded by statute on other grounds as stated in *LeClerc v. Webb* (E.D.La. 2003) 270 F.Supp.2d 779, 792-793.)

absolute immunity from damage suits based on legislative acts.'[11]  [Citation.] To determine whether a governmental action qualifies as 'legislative,' the California courts focus on whether governmental actions 'contain matter which is properly to be regarded as legislative in character and effect.' " (*Schmidt, supra,* 693 F.3d at pp. 1138-1139, fn. omitted.)  And in this regard, the circuit court referred to its preceding discussion explaining why the adoption of the new SJO policy was " 'legislative in character.' "  (*Id.* at p. 1139.)

In short, the circuit court concluded the only material distinction in legislative immunity as understood and applied by the federal courts and the California courts is the foundation to which this common law doctrine is tethered—a conclusion with which we agree.  (Compare, e.g., *Bogan, supra,* 523 U.S. at pp. 48-49 [legislative immunity " 'has [its] taproots in the Parliamentary struggles of the Sixteenth and Seventeenth Centuries' and was 'taken as a matter of course by those who severed the Colonies from the Crown and founded out Nation' "; the "Federal Constitution, the constitutions of many of the newly independent States, and the common law thus protected legislators from liability for their legislative activities"] & *Rizzo, supra,* 214 Cal.App.4th at p. 939 [" 'The powers of state government are legislative, executive, and judicial.  Persons charged with the exercise of one power may not exercise either of the others except as permitted by this Constitution.' [Citation.]  Separation of powers means that 'legislators have absolute immunity from damage suits based on legislative acts' [citation]," as well as "suits for declaratory and injunctive relief"].)

---

[11]  This immunity also extends to suits for injunctive and declaratory relief.  (*Esparza, supra,* 224 Cal.App.4th at p. 460; *Rizzo, supra,* 214 Cal.App.4th at pp. 939-940.)

Otherwise, our state courts, as do the federal courts, first examine the authority of the defendant to take the challenged action and next consider whether the action is legislative in character. (See, e.g., *Rizzo, supra,* 214 Cal.App.4th at pp. 940-944 [legislative immunity applies to authorized acts, not ultra vires acts]; *D'Amato, supra,* 167 Cal.App.4th at pp. 876-879 [acts allegedly afflicted with conflict of interest were nevertheless largely legislative in character and thus could not support indictment]; *Steiner, supra,* 50 Cal.App.4th at pp. 1787-1788 [" 'The essentials of the legislative function are the determination of the legislative policy and its formulation and promulgation as a defined and binding rule of conduct.' " Quoting *Yakus v. United States* (1944) 321 U.S. 414, 424)].)[12]

We therefore conclude *Schmidt* and other federal cases holding legislative immunity barred actions against courts and individual judges provide a sound template here. (E.g., *Goodwin v. Castille* (3d Cir. 2012) 465 Fed.Appx. 157, 160-161 (*Goodwin*) [action against state supreme court and individual justices based on court's elimination of a magisterial district, barred by legislative immunity]; *Gallas v. Supreme Court of Pennsylvania* (3d Cir. 2000) 211 F.3d 760, 774-777 (*Gallas*) [action against state supreme court and individual justices based on court's reorganization of judicial district that eliminated executive administrator position and created governing board, barred

_____

[12] Thus, contrary to plaintiffs' assertion, the fact *Schmidt* and other federal legislative immunity cases have largely been brought as "civil rights" actions under title 42 United States Code section 1983, is immaterial. As the United States Supreme Court has explained, legislative immunity is a venerable common law doctrine that significantly pre-dates the enactment of title 42 United States Code section 1983. (*Bogan, supra,* 523 U.S. at p. 49 ["legislators were entitled to absolute immunity from suit at common law and [] Congress did not intend the general language of § 1983 to 'impinge on a tradition so well grounded in history and reason' "].)

19

by legislative immunity]; *Alia v. Michigan Supreme Court* (6th Cir. 1990) 906 F.2d 1100, 1102 [action against state supreme court and individual justices based on court's promulgation of mediation rule, barred by legislative immunity].)

We further conclude the Chief Justice's promulgation of the revised TAJP was both within her sphere of authority and legislative in character.

As we have discussed, it has long been recognized that the "manner, method, or criteria for selection of duly qualified assigned judges is within the inherent power of the Supreme Court and within the discretion of the Chief Justice in the exercise of her constitutional authority to make the assignments" and that this authority extends to the TAJP. (*Mosk, supra,* 25 Cal.3d at p. 483; *Mudge, supra,* 54 Cal.App.4th at pp. 412-414; 96 Ops.Cal.Atty.Gen., *supra,* at p. 37.)

That the Chief Justice has not been invested with the state's "entire" legislative authority over the assignment of judges, given the statutory underpinnings of the TAJP, is not, contrary to plaintiffs' assertion, fatal to the application of legislative immunity. (*Schmidt, supra,* 693 F.3d at p. 1133, fn. 11.) As did the plaintiff in *Schmidt*, plaintiffs cite to *Supreme Court of Virginia v. Consumers Union of the United States, Inc.* (1980) 446 U.S. 719 (*Consumers Union*)[13], wherein the United States Supreme Court held that to the extent the plaintiff's constitutional challenge was based on the Virginia Supreme Court's promulgation of state bar rules prohibiting attorney advertising, the action against the court and the chief justice was barred by legislative immunity. (*Id.* at pp. 731-734.) In so concluding, the high court observed that the state had delegated to its Supreme Court the state's "entire

---

[13] Superseded by statute on other grounds as stated in *LeClerc v. Webb, supra,* 270 F.Supp.2d 779.

legislative power with respect to regulating the Bar, and its members are the State's legislators for the purposes of issuing the Bar Code." (*Id.* at p. 734.) The court did not suggest, however, that a state legislature must completely abdicate its authority to an administrative or judicial body before these coordinate branches of government can exercise "legislative" authority. Nor has any federal court ever disagreed with *Schmidt* that a state need not turn over the "entirety" of its legislative authority to a court before legislative immunity applies to the court's legislative actions.

There also can be no serious dispute that the Chief Justice's promulgation of the revised TAJP was legislative in character. It was not "an ad hoc decision," as the Chief Justice was not acting on "an individual application." (*Schmidt, supra,* 693 F.3d at p. 1136.) Rather, her action established requirements applicable to all retired judges participating in the TAJP. (*Ibid.*) Nor does the revised program apply to only a few individuals. Rather, it affects every retired judge who participates, from the date of its adoption and into the future. (*Ibid.*) And while the revised program does, indeed, apply to those retired judges who were participating in the program at the time it was revised, it also applies "to all future" participants. (*Id.* at pp. 1136-1137.)

The revisions to the TAJP are also "formally" legislative in character and bear the "hallmarks of traditional legislation." (*Schmidt, supra,* 693 F.3d at p. 1137.) While there was no formal "vote" by the Judicial Council to adopt the revisions, there is no such requirement for an act to be legislative in character. (See *Church v. Missouri* (8th Cir. 2019) 913 F.3d 736, 753-754 [governor's exercise of authority to reduce appropriation was legislative in character]; *Goodwin, supra,* 465 Fed.Appx. at pp. 159, 162 [state supreme court's issuance of *per curiam* order eliminating magisterial district was legislative in character]; *Johnson v. Kernan* (N.D.Cal. Aug. 6, 2019, No. 17-07133 BLF)

21

2019 WL 3718587 *5 [department chief's promulgation of regulations pursuant to statutory authorization was legislative in character].)

What is pivotal is that the Chief Justice acted "pursuant to a constitutionally valid protocol" (*Goodwin, supra,* 465 Fed.Appx. at p. 162) and did so after an ample deliberative process, which included review by the Judicial Council's Trial Court Presiding Judges Committee, the Court Executives Advisory Committee, and the Administrative Presiding Justices Advisory Committee, as well as over 50 transition meetings and conference calls between Judicial Council staff and individual presiding judges and court executive officers.

Thus, the revisions were "certainly a discretionary act" that reflected a carefully weighed policy change, implicating budgetary priorities and the provision of judicial services. (*Schmidt, supra,* 693 F.3d at p. 1137; see *Goodwin, supra,* 465 Fed.Appx. at p. 161 [state supreme court's *per curium* order eliminating magisterial district "effectuated a general policy-making decision to reorganize the structure of the magisterial district courts"]; *Gallas, supra,* 211 F.3d at pp. 774-775 [state supreme court's order reorganizing administration of judicial district "involved a 'policy-making decision of a general scope' "].)

Accordingly, promulgation of the revised TAJP was not, as plaintiffs assert, a mere administrative act falling outside the bounds of legislative immunity. Indeed, as we have noted, the federal courts have, in like contexts, rejected similar claims that courts and/or individual justices performed only administrative acts. (*Schmidt, supra,* 693 F.3d at p. 1137, fn. 15 [court's promulgation of new SJO policy was not a mere personnel action affecting only a limited number of individual employees]; *Gallas, supra,* 211 F.3d at p. 775, fn. 16 [action by "the highest court of a state exercis[ing]

22

its direct constitutional authority to promulgate rules and orders governing the 'practice, procedure and . . . conduct' of states courts" is protected by legislative immunity]; see *Bogan, supra,* 523 U.S. at pp. 55-56 [local legislators' adoption of ordinance eliminating department staffed by single employee was "a discretionary, policymaking decision" with "prospective implications," and while it involved the termination of a position, it was "unlike the hiring or firing of a particular employee"]; *Esparaza, supra,* 224 Cal.App.4th at pp. 460-463 [board of supervisor's action eliminating public safety office and merging functions with county sheriff's department, resulting in the elimination of plaintiffs' positions, was legislative action].)

### *Enforcement of New TAJP Requirements*

A more difficult issue is whether plaintiffs can pursue a lawsuit for prospective declaratory relief against the Chief Justice and Judicial Council based on "enforcement" of the new TAJP requirements under the reasoning of *Consumers Union.*

As we have discussed, the United States Supreme Court held in *Consumers Union* that legislative immunity foreclosed claims against the Virginia Supreme Court and its chief justice based on the court's promulgation of new ethics rules prohibiting lawyers from advertising. (*Consumers Union, supra,* 446 U.S. at pp. 724-725, 731-734.) Thus, "[i]f the sole basis" of the plaintiff's claims "were the issuance of, or failure to amend, the challenged rules," legislative immunity would have entirely barred the lawsuit. (*Id.* at p. 734.) However, the state supreme court "perform[ed] more than a legislative role with respect to the State Bar Code." (*Ibid.*) It also heard appeals in bar disciplinary proceedings and, in addition, had "independent enforcement authority of its own." (*Ibid.*) The high court held that, in this latter capacity, the state Supreme Court and its Chief Justice

23

were "proper defendants in a suit for declaratory and injunctive relief, just as other enforcement officers and agencies." (*Id.* at p. 736.) With no claim of judicial immunity before it, the Supreme Court expressly did not reach the scope of that doctrine. (*Ibid.*)

The trial court here concluded *Consumers Union* was inapposite because "[t]he instant case involve[d]" only an "exercise of rulemaking authority governing the TAJP" and not the "exercise of enforcement authority against individuals." However, this is too narrow a view of the plaintiffs' claim. Plaintiffs alleged they submitted applications for temporary appointment but will be adversely impacted by the new TAJP provisions given their prior extensive participation in the program. Plaintiffs have not, at this point, alleged they have received no assignments. But this is not fatal given that they filed their lawsuit only six months after the new provisions went into effect. Further, given the way in which temporary appointments are made—a retired judge does not apply to fill a particular position but rather applies to be a participant in the TAJP and awaits call by the Chief Justice—generally the most a plaintiff can allege with respect to implementation and/or enforcement of the new TAJP provisions is that he or she applied for and was accepted into the program but then, in contrast to his or her prior service, received no appointments.

Similar to the dual role of the Virginia Supreme Court and its Chief Justice in *Consumers Union* in promulgating and enforcing that state's bar rules, our Chief Justice has a dual role with respect to the TAJP—she both sets policy for the TAJP, as she did by promulgating the challenged changes to the program, and makes individual assignments pursuant to that policy. As we have discussed, there is no question the former activity is legislative in character. The latter actions, however, are different in character and fall

24

within the Chief Justice's unique constitutional and statutory authority to manage the judicial branch and thus come within the bounds of judicial immunity (and also discretionary immunity), rather than legislative immunity. (See Gov. Code, § 820.2; *Caldwell, supra,* 10 Cal.4th at pp. 979-984; *Mudge, supra,* 54 Cal.App.4th at pp. 411-412; 96 Ops.Cal.Atty.Gen., *supra,* at p. 37.)

Thus, while we agree with the trial court that the Chief Justice, in marshalling and deploying our state's judicial resources, is not engaged in conduct that can be fairly described as mere administrative enforcement activity, as was the case with respect to the Virginia Supreme Court's enforcement of the state bar rules in *Consumers Union*, that does not alter the fact that the Chief Justice has a dual role with respect to the TAJP and that legislative immunity applies only to her role in formulating and promulgating the policies and rules that govern the program.[14] (See *Consumers Union, supra,* 446 U.S. at p. 736.)

We therefore turn to the reach of judicial immunity, which the United States Supreme Court considered in the wake of *Consumers Union* in *Pulliam v. Allen* (1984) 466 U.S. 522 (*Pulliam*), concluding judicial immunity did not, in that case, bar injunctive relief. The high court first observed that the

---

[14] We note that in *Esparza,* the Court of Appeal stated, "legislative immunity extends beyond the adoption of the enactment to its implementation." (*Esparaza, supra,* 224 Cal.App.4th at p. 462.) However, the appellate court made this statement in the course of pointing out that the plaintiffs' claim against the county, based on action by the board of supervisors, did not "stem from individualized employment decisions." (*Ibid.*) But here we are addressing allegations of individualized appointment decisions impacting specific, individual TAJP applicants. More significantly, *Esparaza* did not involve an action by a court or judicial officer, legislative or otherwise, and therefore that court had no occasion to, nor did it, discuss *Consumers Union.*

appellate courts that had addressed the issue were "in agreement" that judicial immunity does not categorically bar injunctive relief.  (*Id.* at p. 528.)  The court next pointed out that while at common law "there was no such thing as an injunction against a judge" due to the jurisdictional limitations of the English courts (*id.* at p. 529), a "parallel" could be found "in the collateral prospective relief available against judges through the use of the King's prerogative writs." (*Ibid.*)  After an extensive discussion of the historical use of such writs, the court concluded this indicated there was no "inconsistency" between judicial immunity principles protecting the courts and judiciary from harassing litigation, and the availability of collateral injunctive relief "in exceptional cases." (*Id.* at p. 536.)

The high court then reviewed its own precedent, observing it was "fully consistent with the common law's rejection of a rule of judicial immunity from prospective relief" and the court had never embraced a rule of judicial immunity from such relief.  (*Pulliam*, *supra*, 466 U.S. at p. 536.)  It pointed out "injunctive relief against a judge raises concerns different from those addressed by the protection of judges from damages awards," and that the requirements for obtaining equitable relief—an inadequate remedy at law and irreparable harm—"severely curtail the risk that judges will be harassed and their independence compromised by the threat of having to defend themselves against suits by disgruntled litigants." (*Id.* at pp. 537-538.)

As a result of the court's conclusion that judicial immunity did not foreclose prospective injunctive relief, the judge against whom such relief had been granted (based on actions that were indisputably judicial in character) was subject to an attorney fee award under title 42 United States Code section 1988.  (*Pulliam*, *supra*, 466 U.S. at pp. 541-544.)

There was a vigorous dissent (*Pulliam*, *supra*, 466 U.S. at pp. 544-557, dis. opn. Powell, J.), and after heavy lobbying by jurists, Congress eventually responded by amending title 42 United States Code section 1983 to rein in *Pulliam's* holding and prohibit injunctive relief against judicial officers in civil rights cases except where declaratory relief is unavailable or a judge has violated a declaratory decree. (See *Justice Network Inc. v. Craighead County* (8th Cir. 2019) 931 F.3d 753, 763 (*Justice Network*.) "In other words, 'judicial immunity [now] typically bars claims for prospective injunctive relief against judicial officials acting in their judicial capacity. Only when a declaratory decree is violated or declaratory relief is unavailable would plaintiffs have an end-run around judicial immunity.' " (*Ibid.*)

Thus, it is generally recognized by the federal courts that judicial immunity, unlike legislative immunity, does not foreclose suit for prospective *declaratory* relief and in limited circumstances does not foreclose injunctive relief. (*Justice Network, supra,* 931 F.3d at pp. 763-764.)

California's courts have had little to say in published opinions about the reach of judicial immunity. In *Greene v. Zank* (1984) 158 Cal.App.3d 497 (*Greene*), a bar applicant brought a title 42 United States Code section 1983 claim against the State Bar, the Committee of Bar Examiners, and the State Bar attorney in charge of pre-admission investigations. (*Id.* at p. 500.) The trial court sustained the defendants' demurrer on the ground of quasi-judicial immunity, and the court of appeal affirmed. (*Ibid.*) In doing so, the appellate court applied federal law, including *Consumers Union* and *Pulliam*. (*Id.* at pp. 506-508.) It also noted judicial immunity "does not absolutely insulate judicial officers from declaratory or injunctive relief" (*id.* at p. 507, fn. 10)—which remains an accurate statement of the law, even with the subsequent

amendment of title 42 United States Code section 1983 severely limiting prospective injunctive relief.

In *Lezama v. Justice Court* (1987) 190 Cal.App.3d 15 (*Lezama*), a number of misdemeanants sued the court in which they had been convicted, claiming they had been improperly assessed public defender fees without a determination as to their ability to pay. They alleged state law claims for violating the Penal Code and civil rights claims under title 42 United States Code section 1983 and sought declaratory and injunctive relief. (*Lezama,* at pp. 18-19.) The trial court set aside the fee assessments but denied equitable relief on the ground it lacked authority to grant such relief and also denied attorney fees. (*Id.* at p. 20.) One of the plaintiffs appealed, and the Court of Appeal affirmed, but on a different ground. Stating the appeal turned on the plaintiff's entitlement to injunctive relief, and citing to *Pulliam,* the court concluded the plaintiff could not establish either prerequisite for such relief—an inadequate remedy at law and serious risk of irreparable harm. (*Id.* at p. 21.) The court went on to conclude the plaintiff also did not satisfy the requirements for fees under Code of Civil Procedure section 1021.5 (based on his success in setting aside the assessment), nor was he entitled to fees under title 42 United States Code section 1988 given his failure to pursue his legal remedies in the criminal case. (*Lezama,* at pp. 23-24.) Thus, *Lezama* suggests California's view of the scope of judicial immunity accords with that of the federal courts.

Since it appears to be the universal view of the federal courts, with sound basis, that the common law doctrine of judicial immunity has never foreclosed declaratory relief, we take that view, as well.[15]

---

[15] Judicial immunity does foreclose a damages award. (See *Huminski v. Corsones* (2d Cir. 2004) 396 F.3d 53, 73-75, 77.)

In fact, in *Stewart v. Bird* (1979) 100 Cal.App.3d 215, the Chief Justice and the Judicial Council were sued for declaratory relief by a retired judge of a justice court who maintained he was eligible to participate in the assigned judge program. (*Id.* at p. 216-217.) The defendants made no claim in that case that they were immune from suit under any theory, and the trial court ruled against the former judge on the merits. The Court of Appeal affirmed, also on the merits. (*Id.* at pp. 218-220.) While it is "axiomatic that cases are not authority for propositions not considered" (*People v. Ault* (2004) 33 Cal.4th 1250, 1268, fn. 10), *Stewart* nevertheless is in keeping with the then prevailing, as well as the current, view that judicial immunity does not foreclose actions for declaratory relief.

The claim advanced in the instant case illustrates the practical soundness of the view that judicial immunity does not foreclose actions seeking prospective declaratory relief. In *Schmidt*, the plaintiff claimed only that the superior court adopted its more stringent SJO policy in retaliation for her exercise of First Amendment rights; she did not allege the new policy, in and of itself, was unlawful in any way. (*Schmidt*, *supra*, 693 F.3d at pp. 1126-1127.) Here, in contrast, plaintiffs make no claim the Chief Justice had an improper motive in promulgating the changes to the TAJP. Rather, they assert these changes render the TAJP, itself, unlawfully discriminatory and the program will remain so on a going forward basis. Had the Legislature or a state agency created such an allegedly discriminatory program, there would be no question that the program could be challenged through suit against the state or the administrative officials enforcing it (although "discretionary immunity" might well foreclose damages claims). In short, it is not, nor can it be, the law that any "legislation" promulgated by the courts is, even in its application and enforcement, wholly immune from legal challenge and review.

29

In *Consumers Union*, the United States Supreme Court also observed "mere enforcement authority" does not create "a case or controversy with the enforcement official"—in other words, general enforcement authority, alone, does not make a case justiciable. (*Consumers Union, supra,* 446 U.S. at p. 736, fn. 15.) The court concluded, however, there was "a sufficiently concrete dispute" as to the constitutionality of the attorney advertising ban. (*Ibid.*)

California courts similarly require an "actual controversy" before entertaining a suit for declaratory relief. (See, e.g., *Communities for a Better Environment v. State Energy Resources Conservation & Development Com.* (2017) 19 Cal.App.5th 725, 732-734; *Environmental Defense Project of Sierra County v. County of Sierra* (2008) 158 Cal.App.4th 877, 885. However, an actual controversy can "encompass[] a probable future controversy relating to the legal rights and duties of the parties," although a "probable future controversy must be ripe," meaning " 'the facts have sufficiently congealed to permit an intelligent and useful decision to be made.' " (*Ibid.*) We conclude there is such an "actual controversy" over the changes to the TAJP here, thus overcoming the initial hurdle of justiciability. (See *Communities for Better Environment,* at pp. 736-739 [declaratory relief action challenging constitutionality of statute]; *Environmental Defense Project of Sierra County,* at pp. 884-886 [declaratory relief action challenging local development policy].)

Because we conclude neither legislative immunity nor judicial immunity wholly bars plaintiffs' suit for prospective declaratory relief, we turn to the alternative ground defendants urged in support of their demurrer—that plaintiffs' allegations do not, and cannot, support a disparate impact age discrimination claim under the FEHA.

30

***Sufficiency of Disparate Impact Allegations***[16]

Age discrimination claims can be advanced under a disparate treatment or disparate impact theory. To establish a disparate treatment claim, a plaintiff must prove the defendant intentionally discriminated. (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 354, fn. 20 (*Guz*).) To establish a disparate impact claim, a plaintiff need not prove intent to discriminate, but must prove that "regardless of motive, a *facially neutral* employer practice or policy, bearing no manifest relationship to job requirements, *in fact* had a disproportionate adverse effect on members of the protected class." (*Ibid.*)

Disparate impact claims are cognizable under both the FEHA and the ADEA. (*Smith v. City of Jackson* (2005) 544 U.S. 228, 232 (*Smith*); *Katz v. Regents of the University of California* (2000) 229 F.3d 831, 835 (*Katz*); *Villafana, supra,* 57 Cal.App.5th at p. 1017.) And because " 'their objectives are the same, California courts have relied upon federal law interpreting title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e et seq.) and the [ADEA] (29 U.S.C. § 621 et seq.) to interpret the FEHA. [Citations.]' (*Linsley v. Twentieth Century Fox Film Corp.* (1999) 75 Cal.App.4th 762, 766. . . .)" (*Rosenfeld v. Abraham Joshua Heschel Day School, Inc.* (2014) 226 Cal.App.4th 886, 894, fn. 4.)

As the United States Supreme Court has emphasized, "disparate-impact liability has always been properly limited in key respects" to avoid the

---

[16] We consider the sufficiency of the allegations of a complaint de novo. "In making our determination, we admit all facts properly pleaded [citation]; we ' "give the complaint a reasonable interpretation, reading it as a whole and its parts in their context" ' . . . [and] [w]e read the allegations 'in the light most favorable to the plaintiff and liberally construed with a view to attaining substantial justice among the parties.' " (*Villafana v. County of San Diego* (2020) 57 Cal.App.5th 1012, 1016-1017 (*Villafana*).)

serious problems that would ensue "if such liability were imposed based solely on a showing of a statistical disparity." (*Texas Dept. of Housing & Community Affairs v. Inclusive Communities Project, Inc.* (2015) 576 U.S. 519, 540; see *Hardie v. Nat. Collegiate Athletic Association* (9th Cir. 2017) 876 F.3d 312, 319-320.) For example, "a disparate-impact claim that relies on a statistical disparity must fail if the plaintiff cannot point to a defendant's policy or policies causing that disparity," and "[a] robust causality requirement" ensures that a disparity, alone, " 'does not, without more, establish a prima facie case of disparate impact.' " (*Texas Dept. of Housing,* at p. 542.) In addition, the "reasonable factor other than age" (RFOA) provision of the ADEA "plays its principal role by precluding liability if the adverse impact was attributable to a nonage factor that was 'reasonable.' " (*Smith, supra,* 544 U.S. at p. 239; see *Hardie,* at p. 320 ["defendant's practice need not be 'essential' or 'indispensable' to achieving its stated goal, but the relationship between the practice and its purpose must be more than 'insubstantial' "].) The FEHA does not have a RFOA provision but includes a "business necessity" defense (which we discuss, *infra*), as well as other defenses. (Cal. Code Regs., tit. 2, § 11010, subd. (b); see generally Chin et al., Cal. Practice Guide: Employment Litigation (The Rutter Group 2020) ¶¶ 8:816, 8:830, pp. 8-115 to 8-116.) These limitations on disparate-impact liability are "necessary to protect potential defendants against abusive disparate-impact claims" and to prevent the displacement of "valid governmental and private priorities." (*Texas Dept. of Housing,* at p. 544.)

Thus, in a disparate impact case, a plaintiff must " 'allege[] and prove[], usually through statistical disparities, that facially neutral employment practices adopted without a deliberately discriminatory motive nevertheless have

such significant adverse effects on protected groups that they are "in operation . . . functionally equivalent to intentional discrimination." ' " (*Jumaane v. City of Los Angeles* (2015) 241 Cal.App.4th 1390, 1404-1405, quoting *Harris v. Civil Service Com.* (1998) 65 Cal.App.4th 1356, 1365, italics omitted.) " ' "[S]tatistical disparities must be sufficiently substantial that they raise such an inference of causation." ' " (*Jumaane,* at p. 1405, quoting *Carter v. CB Richard Ellis, Inc.* (2004) 122 Cal.App.4th 1313, 1323–1324 (*Carter*).)

### *Conclusory Allegations*

Defendants first maintain plaintiffs' substantive allegations are conclusory and particularly bereft when it comes to causation. We agree.

Plaintiffs allege the 1,320 day service limitation "has a disparate impact on plaintiffs and other persons of their age in that it causes them to be demonstrably disadvantaged vis-à-vis younger participants in the AJP in the following manner: plaintiffs, who have 1,320 or more days' experience in the Assigned Judges Program, will no longer by given assignments unless they receive an 'exception' to the policy." "The policy requiring exceptions for participation in the AJP does not apply to younger, more recently retired judges, whose terms, conditions, and privileges of employment have not been changed. It applies only to judges with more than 1,320 days' service in the AJP ('1320 Judges'), including plaintiffs herein." Plaintiffs additionally allege, "[m]ost assignments under the exceptions are either to Family Law Departments or to courts located in communities far from the home counties of plaintiffs and most 1320 Judges. . . . In addition, 'exception' assignments are in unfamiliar courts with unfamiliar practices." Thus, "1320 Judges, in order to continue to work, are required to accept assignments under these discriminatory terms and conditions," which plaintiffs further claim are "not based on any bona fide job qualifications."

Plaintiffs are correct that disparate impact allegations need not be as specific as the evidentiary showing required to overcome a defense motion for summary judgment. (See e.g. *Sypherd v. Lazy Dog Restaurants, LLC* (C.D. Cal. July 24, 2020, No. EDCV 20-921 JGB (KKx)) 2020 WL 5846481 *4; *Garay v. Lowes Home Centers, LLC* (D. Or., Nov. 14, 2017, No. 1:17-cv-00269-MC) 2017 WL 5473887 *3 (*Garay*); *Borja-Valdes v. City and County of San Francisco* (N.D. Cal. Sept. 18, 2015, No. 3:14–cv–04168–CRB) 2015 WL 5522287 *7 ["A plaintiff . . . need not plead a *McDonnell Douglas*[17] prima facie case to survive a motion to dismiss."].)

However, the complaint must allege facts or statistical evidence demonstrating a causal connection between the challenged policy and a significant disparate impact on the allegedly protected group. (See *Texas Dep't of Housing, supra,* 576 U.S. at p. 543; e.g., *Adams v. City of Indianapolis* (7th Cir. 2014) 742 F.3d 720, 733 [complaint suffered from "complete lack of factual content directed at disparate-impact liability"; there were no "allegations about the number of applicants and the racial makeup of the applicant pool as compared to the candidates promoted" or the "department as a whole," "no allegations about the racial makeup of the relevant workforce" or "the supervisory ranks" in the departments, and "no factual allegations tending to show a causal link between the challenged testing protocols and a statistically significant racial imbalance" in the higher ranks]; *Garay, supra,* 2017 WL 5473887 *3 ["disparate impact claim is properly dismissed at the pleading state when it lacks 'basic allegations' regarding statistical methods and comparison, or 'any other factual material to move the disparate-impact claim over the plausibility threshold' "; amended complaint "provide[d] only the

---

[17] *EEOC v. McDonnell Douglas Corp.* (8th Cir.1999) 191 F.3d 948 (*McDonnell Douglas).*

conclusory allegation that the policy-driven terminations" fell more heavily on older workers and did not "allege how many people [were] employed by Lowes, how many total people ha[d] quit or been fired over the same four-year period, the ages of those who quit or were fired, or any other information that would allow the Court to reasonably connect [the] fifteen terminations [of older workers] to the alleged policy or policies"]; *Jianqing Wu v. Special Counsel, Inc.* (D.D.C. 2014) 54 F.Supp.3d 48, 55 ["speculative correlation between age and experience" is "insufficient to state a claim for disparate impact"; at a minimum, plaintiff was required to proffer "some form of statistical or anecdotal evidence showing that older candidates were being excluded systematically"].)

Plaintiffs' allegations suffer from the same sort of infirmities identified in the cases cited above. There are, for example, no specifics as to the total number of participants in the TAJP, or the number of participants allegedly adversely impacted by the challenged changes to the program, or even the age "group" allegedly adversely impacted. Nor are there any "basic allegations" of statistical methods and comparison, or even any anecdotal information of a significant *age*-based disparity.

### *Leave to Amend*

Plaintiffs predictably ask for leave to amend should we find their allegations lacking. Defendants assert this would be a futile exercise for two reasons.

### *Preliminary Evidentiary Showing*

Defendants first point to the plaintiffs' evidentiary showing in support of their motion for a preliminary injunction and claim this showed only an impact on " 'Hard Working Assigned Judges' " and no age-based impact suffi-

35

cient to establish a prima facie case of discrimination. Defendants cite no authority, however, for the proposition that it is appropriate to deny leave to amend following the sustaining of a demurrer, on the basis of an evidentiary showing made at the outset of a case in support of preliminary injunctive relief.

We also observe that the principal case defendants cite in support of their assertion that, given the preliminary evidentiary showing, leave to amend should be denied, *Carter, supra,* 122 Cal.App.4th 1313, was not a pleading case. Rather, on the basis of a fully developed trial record, the Court of Appeal reversed the denial of a defense motion for judgment notwithstanding the verdict on the ground the plaintiffs failed to prove age discrimination under a disparate impact theory. (*Id.* at p. 1326.) Thus, defendants are ahead of themselves in pointing to *Carter* as authority for denying leave to amend.

### *Subgroup Within Protected Age Class*

Defendants secondly claim leave to amend should be denied because plaintiffs' disparate impact claim is based on the alleged impact of the new TAJP provisions on a "subgroup" of the retired judges who have applied for temporary appointments (specifically, judges who have already exceeded the 1,320 day service maximum). Defendants maintain a disparate impact age discrimination claim cannot, as a matter of law, be based on impact on a "subgroup" of the class protected by the FEHA (persons 40 years of age and over), to which all retired judges, by definition, belong.

At this point, we return to *Carter.* In that case, the defendant company undertook a reorganization that changed the employment status of administrative managers. (*Carter, supra,* 122 Cal.App.4th at p. 1319.) About 15 of these 57 individuals were eventually promoted to new regional positions. (*Id.*

36

at p. 1320*.)* All those promoted were women, and most were over 40 years of age. Plaintiff was not promoted and sued, ultimately going to trial and prevailing on a disparate impact age discrimination claim. (*Id.* at pp. 1317, 1320-1321.) After unsuccessfully moving for judgment notwithstanding the verdict, the company appealed. (*Id.* at p. 1317.) The Court of Appeal reversed. (*Id.* at p. 1326.)

The court first observed the case did not "fit well within the normal boundary of a disparate impact case. Plaintiff assert[ed] that defendant's reorganization caused a disparate impact on women and those over 40 because the reorganization plan demoted administrative managers, all but one of whom were women, and about half of whom were over 40." (*Carter, supra,* 122 Cal.App.4th at p. 1321.) "Reflecting a basic misunderstanding of the meaning of disparate impact," the plaintiff put "great stock in her assertion that '*no other group of employees* [other than administrative managers] *was adversely affected*'" by the reorganization." (*Id.* at pp. 1321-1322.) This proved "too much," said the court, as the import was "that no woman or person over the age of 40 was adversely affected *unless* she was an administrative manager. Women were not affected as a group. Persons over 40 were not affected as a group. Rather, administrative managers were affected as a group." (*Id.* at p. 1322.)

"This lapse in logic—characterizing a category of employees as 'protected' simply because employees in that category are part of a larger protected class—[was] the type of error Justice O'Connor warned against in *Watson* [*v. Fort Worth Bank and Trust* (1988) 487 U.S. 977 (*Watson*)[18]]. . . . If a plaintiff can proceed with a disparate impact case on this basis, employers

---

[18] Superseded by statute on other grounds as stated *in Phillips v. Cohen* (6th Cir. 2005) 400 F.3d 388, 398.

will necessarily hire by quotas in all job categories as the only means by which to avoid repeatedly justifying in a court of law the business necessity of every decision adversely affecting a segment of its workforce." (*Carter, supra,* 122 Cal.App.4th at p. 1322.) Thus, " '[o]nce the employment practice at issue has been identified, causation must be proved; that is, the plaintiff must offer statistical evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion of applicants for jobs or promotions *because of* their membership in a protected group. . . . [S]tatistical disparities must be sufficiently substantial that they raise such an inference of causation.' " (*Id.* at pp. 1323-1324, quoting *Watson,* at pp. 994-995, italics added.) Accordingly, "the mere fact that each person affected by a practice or policy is also a member of a protected group does not establish a disparate impact." (*Carter,* at p. 1324.)

More specifically, the "plaintiff failed to establish a prima facie case of disparate impact discrimination because her data set was incomplete, one of the potential failings of statistical proof mentioned in *Watson.* [She] offered no evidence regarding the gender or age composition of *all* of defendant's employees. The evidence was entirely about the effect of the reorganization on the administrative managers, as though it were a group protected by law." (*Carter, supra,* 122 Cal.App.4th at p. 1325.)

In fact, the defendant "employed close to 10,000 people. There was no evidence as to the gender and age composition of the entire work force. But [even] assuming, for purposes of illustration, all of the administrative managers were adversely affected (which they were not), and assuming roughly half of the entire work force were either women or persons over 40 years old, and accepting the evidence that no group in the company other than administrative managers was adversely affected by the reorganization," this meant "a

38

mere 1.14 percent of the women or persons over 40 suffered an adverse impact. Even if [the court assumed] only 25 percent of the total employee population was female or over the age of 40, a trifling 2.28 percent of the protected classes was affected. And, even more fundamentally, [the] plaintiff did not present evidence of the total impact on women or those over 40." (*Carter, supra,* 122 Cal.App.4th at p. 1326.) In the absence of such evidence, "a prima facie case [was] not established." (*Ibid.*)

*Carter* relied in considerable part on *Katz, supra,* 229 F.3d 831. In that case, the Regents of the University of California, under pressure to downsize its workforces at the Lawrence Livermore National Laboratory, the Lawrence Berkeley National Laboratory, and the Los Alamos National Laboratory, offered an early retirement incentive program to members of one retirement plan (the University of California Retirement Plan (UCRP) plan), whose average age was 55, but not to members of another retirement plan (the Public Employees Retirement System (PERS) plan), whose average age was 60. (*Id.* at p. 833.) While the university considered providing a similar plan to the PERS plan group, it entailed significant cost, and the president of the university ultimately decided against doing so. (*Id.* at p. 834.) Members of the PERS plan sued under the ADEA and the FEHA, alleging intentional and disparate impact age discrimination theories. (*Ibid.*) After denying motions to dismiss and for summary judgment, the district court eventually granted a defense motion in limine just prior to trial, ruling the plaintiffs could not, as a matter of law, establish a case of disparate impact. (*Ibid.*) After the university prevailed at trial on the plaintiffs' intentional discrimination claim, the plaintiffs appealed the dismissal of their disparate impact claim. The circuit court affirmed.

The gist of the employees' disparate impact claim was that "(1) PERS members tended, on average, to be about 5 years older, and (2) it was increasingly likely that older employees would be members of the PERS program." (*Katz, supra,* 229 F.3d at p. 835.)  This lead the court to initially observe that all employees potentially eligible for early retirement "were within the class of persons protected by the ADEA," and "[a]lthough the Ninth Circuit ha[d] not expressly addressed the issue, some circuits ha[d] held that claims based on the adverse impact of a policy among sub-classes within a larger protected class are not cognizable.  *See, e.g.,* [*McDonnell Douglas Corp., supra,*] 191 F.3d 948 . . . ; *Criley v. Delta Air Lines, Inc.,* 119 F.3d 102 (2d Cir.1997)." (*Katz,* at p. 835.)  Nor did the *Katz* court reach the issue, given its conclusion that the "plaintiffs failed to demonstrate causation, which requires substantial statistical evidence sufficient to raise an inference that the disparate impact fell upon employees of a protected age group." (*Id.* at p. 836, citing *Watson, supra*, 487 U.S. at p. 994.)

The circuit court explained that while the plaintiffs "show[ed] that they were treated differently on the basis of their membership in the PERS program, their evidence demonstrate[d] that only 238 of the 895 employees at the laboratories age 60 or over (roughly 27 percent) were adversely impacted by the University's decision.  Given the legitimate reason advanced for the University's decision, the plaintiff's statistical evidence [was] insufficient to raise an inference that the disparate impact fell upon employees by virtue of their membership in a protected age group." (*Katz, supra,* 229 F.3d at p. 836.)  In short, "the statistical evidence of disparate impact upon employees age 60 or over [was] minimal compared to the number of employees of that age group not adversely affected by the University's decision." (*Ibid.*)

40

"At best," the *Katz* plaintiffs "demonstrated only that the average age of the PERS members was 5 years older than the average age of eligible UCRP members, and plaintiffs concede[d] that numerous UCRP employees older than the average PERS member were offered [the retirement incentive]. The factor that determines an employees' eligibility to participate in [the retirement incentive] is thus not an employee's age itself, but instead whether that employee is a member of UCRP. [Citation.] Accordingly, [the] plaintiffs failed to demonstrate the requisite causal link for a disparate impact claim, and the district court did not err by dismissing the claim prior to trial." (*Katz, supra,* 229 F.3d at p. 836; see *K.H. v. Secretary of the Dept of Homeland Sec.* (N.D. Cal. 2017) 263 F.Supp.3d 788, 794, 796 (*K.H.*) [granting summary judgment on disparate impact claim where average employee age at allegedly "targeted" field offices was 44.76 years and at other field offices, was 41.5 years, because "a 3–year age difference is insufficiently substantial"; that the comparative group was, itself, "*above* the age 40 cutoff for protected status under the ADEA," "[a]lthough perhaps not determinative," also "weigh[ed] against a finding that the office closures had a 'significantly adverse or disproportionate impact on persons of a particular [age]' "].)

Thus, neither *Carter* nor *Katz* held that a disparate impact claim cannot be based on a claim that an identifiable employment policy discriminates against a more senior "subgroup" of employees over the age of 40. (See *Schechner v. KPIX-TV* (N.D. Cal., Jan. 13, 2011, No. C 08–05049 MHP) 2011 WL 109144 *4 (*Schechner*) [neither Ninth Circuit nor California courts have decided the issue].) Rather, both courts pointed to the fact that the plaintiffs focused on subgroups within the protected over-40 age group as a

41

unique feature of the cases that underscored the necessity of a rigorous examination of the evidence, and particularly the statistical evidence. (See *Carter, supra,* 122 Cal.App.4th at p. 1321; *Katz, supra,* 229 F.3d at p. 835.)

Defendants do not claim the contrary, but cite two district court cases, one of them being *Schechner,* that have ruled a disparate impact claim cannot be based on asserted impact on a subgroup of the protected age class.

In *Schechner*, the two plaintiffs were laid off as part of a reduction-in-force (RIF) in which five "on-air" reporters, ranging from 47 to 66 years of age, were discharged. (*Schechner, supra,* 2011 WL 109144 *1.) They sued under the FEHA, advancing both disparate treatment and disparate impact claims. The district court granted the employer's motion for summary judgment. (*Ibid.*) In support of their disparate impact claim, the plaintiffs submitted an expert's report that showed "a disproportionate impact of the reduction-in-force on older workers. Within the subgroup of on-air employees, [this] analysis demonstrated a high degree of statistical correlation between those employees who were terminated and age." (*Id.* at *3.)

The defendant maintained, however, that "notwithstanding the statistical correlation between termination and employee age, for purposes of a disparate impact analysis, the only relevant question is whether the reduction-in-force had a disproportionate impact on employees aged 40 or over compared with employees under 40. In other words, even if a 66 year old employee such as Schechner [was] more likely to be terminated than a younger employee, so long as 40+ year olds *as a group* [were] not significantly disproportionately affected by the challenged conduct, [the] plaintiffs' disparate impact claim must fail." (*Schechner, supra,* 2011 WL 109144 *4.)

42

The district court agreed, stating "every" federal Court of Appeal that had addressed the issue had "concluded that it is improper to distinguish between subgroups of employees over the age of 40 and that a disparate impact analysis must compare employees aged 40 and over with those 39 and younger." (*Schechner, supra,* 2011 WL 109144 *4, citing to *McDonnell Douglas Corp., supra,* 191 F.3d at pp. 950–951, *Lowe v. Commack Union Free School Dist.* (2d Cir.1989) 886 F.2d 1364, 1373 (*Lowe*)[19], & qualifiedly citing to *Smith v. Tenn. Valley Auth.* (6th Cir.1991) 924 F.2d 1059.) The district court noted two First Circuit district court cases had ruled to the contrary but concluded the Ninth Circuit was likely to follow the circuit court authority. (*Schechner,* at *4, fn. 4.) "[T]he focus," said the district court, "is on whether older employees, as a protected *group,* are disproportionately affected by a facially neutral employment practice," and "[t]here [was] no dispute that the reduction-in force did not have a statistically significant impact on on-air talent (or on KPIX employees more broadly) aged 40 or older. Even though the five terminated employees [] were all over the age of forty, the average age of KPIX employees after the reduction-in-force remained well over 40." (*Id.* at *4-5.)

*Rudwall v. Blackrock, Inc.* (N.D.Cal. Feb. 28, 2011, No. C09–5176TEH) 2011 WL 767965, also involved a reduction-in force. The court granted summary judgment, including because it had " 'serious doubts' " the plaintiff had "identified an affected group large enough to be statistically significant." (*Id.* at *10.) Citing to and following *Schechner*, the district court agreed that statistical evidence showing only that an older subset of a category of employees

---

[19] Superseded on other grounds by statute as stated in *Karlo v. Pittsburgh Glass Works, LLC* (W.D. Pa., March 31, 2014, No. 2:10-cv-1283) 2014 WL 1319595 *16.

within the defendant company was disproportionately impacted by the layoffs, did not show that employees "aged 40 and over were disproportionately impacted" because all the employees in this category at the time of the reduction-in-force were older than 40 years old. (*Ibid.*) In other words, the relevant statistical data failed to compare "the impact of . . . [the] terminations on employees aged 40 and older to the impact on those aged 39 and younger, and thus they fail[ed] to support a prima facie case of disparate impact age discrimination." (*Id.* at *11.)

However, in more recent years, there has been a shift in the federal legal landscape as to whether a disparate impact age discrimination claim can be based on an impact to an older subgroup within the protected 40 years of age and older age class. While the Second and Eighth Circuits remain of the view that a disparate impact claim cannot accommodate a subgroup analysis (e.g., *Hogan v. Metromail* (S.D.N.Y. 2000) 107 F.Supp.2d 459), the Third and Seventh Circuits have concluded otherwise (*O'Brien v. Caterpillar Inc.* (7th Cir. 2018) 900 F.3d 923 (*O'Brien*); *Karlo v. Pittsburgh Glass Works, LLC* (3d Cir. 2017) 849 F.3d 61 (*Karlo*)), and the Sixth Circuit has indicated it now shares the view of the more recent circuit court cases. (See *Cerjanec v. FCA US, LLC* (E.D.Mi. Aug. 6, 2018, No. 17-10619) 2018 WL 3729063 (*Cerjanec*).[20]) As a consequence, the two First Circuit district court cases noted in

___

[20] The district court, following *Karlo*, denied a motion to dismiss a "subgroup" disparate impact age claims and subsequently certified the issue for interlocutory appeal by the defendant. (*Cerjanec, supra,* 2018 WL 3729063 *4-5; *Cerjanec v. FCA US, LLC* (E.D.Mi. Sept. 4, 2018, No. 17-10319) 2018 WL 7152556.) The Sixth Circuit denied the defendant's request for leave to appeal stating, "Upon consideration of the petition and the response thereto, we find that the issue before us appears to have been previously resolved by *O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308 (1996)." (*In re FCA US LLC* (Sixth Cir. Feb. 8, 2019) No. 18-0106, order denying permission to appeal (of which we take judicial notice on our own motion

*Schechner* are no longer outliers. (*Finch v. Hercules Inc.* (D. Del. 1994) 865 F.Supp. 1104; *Graffam v. Scott Paper Co.* (D. Maine 1994) 848 F.Supp. 1.) Thus, at this juncture, it appears a majority of the federal circuit courts are of the view that a disparate impact claim can be based on discriminatory impact on an older subgroup within the protected 40-years-of-age-and-older class.

The reasoning of the earlier cases is best illustrated by the Eighth Circuit's decision in *McDonnell Douglas* and the Second Circuit's decision in *Lowe.*

*McDonnell Douglas* involved a RIF. The EEOC, alleging the company had engaged in a pattern or practice of terminating employees 55 years or older because of their age, brought both disparate treatment and disparate impact claims. (*McDonnell Douglas, supra,* 191 F.3d at p. 950.) The district court dismissed the disparate impact claim and granted summary judgment on the disparate treatment claim. The circuit court affirmed. (*Ibid.*)

With respect to its disparate impact claim, the EEOC alleged the company's practice "of basing RIF decisions on considerations such as retirement eligibility, merit raises, and salary had a disparate impact on a subgroup of the protected class, namely, those employees aged 55 or older." (*McDonnell Douglas, supra,* 191 F.3d at p. 950.) In support of its claim, the EEOC relied on statistical evidence showing the company laid off 13.7 percent of its employees aged 55 or older, compared to 5.4 percent of its employees under 55. (*Ibid.*)

The circuit court rejected this effort for three reasons. First, "if such claims were cognizable . . . a plaintiff could bring a disparate-impact claim

_____

pursuant to Evidence Code sections 452, subdivisions (c), (d) & 459).) As we shall discuss in detail, *O'Connor* is the principal case relied on by the Third and Seventh Circuits in approving "sub-group" disparate impact age discrimination claims under the ADEA.

45

despite the fact that the statistical evidence indicated that an employer's RIF criteria had a very favorable impact upon the entire protected group of employees aged 40 and older, compared to those employees outside the protected group," and the court did not believe "Congress could have intended such a result." (*McDonnell Douglas, supra,* 191 F.3d at p. 951.)  Second, "if disparate-impact claims on behalf of subgroups were cognizable under the ADEA, the consequence would be to require an employer engaging in a RIF to attempt what might well be impossible: to achieve statistical parity among the virtually infinite number of age subgroups in its work force.  Adoption of such a theory, moreover, might well have the anomalous result of forcing employers to take age into account in making layoff decisions, which is the very sort of age-based decision-making that the statute proscribes." (*Ibid.*)  Third, "employment decisions motivated by factors other than age (such as retirement eligibility, salary, or seniority), even when such factors correlate with age, do not constitute age discrimination," and the court, again, did not believe Congress "intended to impose liability on employers who rely on such criteria just because their use had a disparate impact on a subgroup." (*Ibid.*)

In *Lowe*, the plaintiffs claimed a school district's hiring practices adversely affected applicants over the age of 50. (*Lowe, supra,* 886 F.2d at p. 1372.)  The Second Circuit rejected "recognition of 'sub-groups' " because "[u]nder this approach . . . any plaintiff can take his or her own age as the lower end of a 'sub-protected group' and argue that said 'sub-group' is disparately impacted.  If appellants' approach were to be followed, an 85 year old plaintiff could seek to prove a discrimination claim by showing that a hiring practice caused a disparate impact on the 'sub-group' of those age 85 and above, even though all those hired were in their late seventies." (*Id.* at p. 1373.)  The court did not "believe that such a 'disparity' would support the

46

inference of discrimination that the disparate impact approach permits when those outside a statutorily protected group are preferred over those included in that group" and found "no support in the case law or in the ADEA for the approach to disparate impact analysis" the plaintiffs advocated. (*Ibid.*) This view was not endorsed by the entire panel and was criticized in a concurring opinion that agreed only that the plaintiffs' evidence was insufficient to prove a disparate impact claim based on the posited subgroup. (*Id.* at pp. 1379-1381 (conc. opn. of Pierce, J.).)

The reasoning of the more recent circuit court cases is best illustrated by the Third Circuit's decision in *Karlo*. This was also an RIF case, and layoff decisions had been left to the discretion of certain management personnel, without guidelines or policies. (*Karlo, supra,* 849 F.3d at p. 66.) The plaintiffs, all over the age of 50, asserted both disparate impact and disparate treatment claims. (*Id.* at pp. 66-67.) The Third Circuit reversed a defense summary judgment as to the disparate impact claim. (*Id.* at pp. 66-67, 86.)

The court began its analysis by discussing the "Supreme Court's unanimous opinion in *O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308 . . . (1996), an ADEA disparate-treatment case. *O'Connor* clarified that the ADEA proscribes *age* discrimination, not forty-and-over discrimination." (*Karlo, supra,* 849 F.3d at p. 70.) The plaintiff in *O'Connor* was fifty-six years old when he was fired and was replaced with a younger worker who was over the age of forty, and therefore within the class of individuals protected under the ADEA. (*Ibid.*) The high court held the plaintiff nevertheless could state an age discrimination claim. "The ADEA does not ban discrimination against employees because they are aged 40 or older; it bans discrimination against employees because of their age, but limits the protected class to those who are 40 or older. The fact that one person in the protected class has lost out to

47

another person in the protected class is thus irrelevant, so long as he has lost out *because of his age*." (*Ibid*.)

The circuit court was of the view that the Supreme Court's reasoning "ineluctably leads" to the "conclusion that subgroup claims are cognizable. . . . [¶] The key insight from *O'Connor* is that the forty-and-older line drawn by [title 29 United States Code section] 631(a) constrains the ADEA's general scope; it does not modify or define the ADEA's substantive prohibition against 'discriminat[ion] . . . because of such individual's age.' [Title 29 United States Code section] 623(a)(1). The ADEA protects against '*age* discrimination [] as opposed to "40 or over" discrimination. . . .' " (*Karlo, supra,* 849 F.3d at p. 71.)

The circuit court further pointed out "[t]he disparate-impact provision uses the same operative phrase" as the disparate treatment provision " 'because of such individual's age.' [Title 29 United States Code section] 623(a)(2)." (*Karlo, supra,* 849 F.3d at p. 71.) Moreover, both disparate treatment and disparate impact claims share the same ultimate issue—whether the plaintiff was discriminated against *because* of his or her age. (*Id.* at pp. 71-72.)

The circuit court also found the Supreme Court's opinion in *Connecticut v. Teal* (1982) 457 U.S. 440 (*Teal*), supportive. *Teal* was a Title VII disparate-impact case, which the circuit court viewed as confirming that, "even under a disparate-impact theory, the plain text of the statute is designed to protect the rights of individual employees, not the rights of a class." (*Karlo, supra,* 849 F.3d at p. 72.) In *Teal,* the high court rejected the defendant's " 'bottom-line' " defense that any discrimination in the first phase of its promotional process (a written test) was mitigated by affirmative action efforts in the second phase (selecting employees from within the pool of passing candidates).

48

(*Ibid.*) This ameliorative effort on behalf of other applicants did not justify discriminating "against other members" of the protected class. (*Ibid.*) "The ADEA, like Title VII," said the circuit court, "protects individuals who are members of a protected class, not a class itself." (*Ibid.*)

The circuit court also pointed to the *Teal* majority's response to the dissent's accusation it had confused the distinction between disparate impact and disparate treatment:

> "The fact remains . . . that irrespective of the form taken by the discriminatory practice, an employer's treatment of other members of the plaintiffs' group can be of little comfort to the victims of . . . discrimination. Title VII does not permit the victim of a facially discriminatory policy to be told that he has not been wronged because other persons of his or her race or sex were hired. That answer is no more satisfactory when it is given to victims of a policy that is facially neutral but practically discriminatory. Every *individual* employee is protected against both discriminatory treatment and practices that are fair in form, but discriminatory in operation. [¶] . . . The same reasoning applies to this case. The ADEA 'does not permit the victim of a facially discriminatory policy to be told that he has not been wronged because other persons' aged forty or older were preferred. [Citation.] 'That answer is no more satisfactory when it is given to victims of a policy that is facially neutral but practically discriminatory.'" (*Karlo, supra,* 849 F.3d at p. 73, quoting *Teal, supra,* 457 U.S. at pp. 455-456.)

The circuit court next stated that its view was "supported by the ADEA's remedial purpose. Refusing to recognize subgroup claims would deny redress for significantly discriminatory policies that affect employees most in need of the ADEA's protection." (*Karlo, supra,* 849 F.3d at p. 74.) As the court had stated in "the disparate-treatment context, . . . '[i]f no intra-age group protection were provided by the ADEA, it would be of virtually no use to persons at the upper ages of the protected class. . . .' [Citation.] The same rationale applies to the disparate-impact context. The older the employees affected by a policy, the more confounding favoritism would be included in the

49

rigid forty-and-older sample. Thus, an impact on employees in their seventies may be easier to average out of existence compared to an impact that also affects younger employees. Mandating forty-and-older comparisons would predominantly harm 'those most in need of the statute's protection.' " (*Id.* at pp. 74-75, quoting *Lowe, supra,* 886 F.2d at p. 1379 (conc. opn. of Pierce, J.).)[21]

Finally, the circuit court took issue with the justifications that had been offered in the earlier cases for rejecting sub-group disparate impact claims. It pointed out *Lowe* had been decided before *O'Conner* and thus, in the circuit court's view, had given "improper significance to the forty-and-older line drawn by [title 29 United States Code section] 631(a), and fails to compare the textual similarities between [title 29 United States Code sections] 623(a)(1) and . . . 623(a)(2)." (*Karlo, supra,* 849 F.3d at p. 75.) It also believed *Lowe's* evidentiary concern—that plaintiffs could create arbitrary age groups to create statistical significance—is adequately dealt with by the district court's gate-keeping function. (*Id.* at p. 76.) Thus, the court "reject[ed] the notion that the risk of gerrymandered evidence is so great that it can override what the text of the statute otherwise permits. District courts should, as in any other case, ensure that plaintiffs' evidence is reliable under *Daubert* and provides more than the 'mere scintilla of evidence' needed to survive summary judgment." (*Id.* at p. 78.) The court was accordingly "not persuaded by *Lowe's* legal or practical groundings." (*Ibid.*)

---

[21] In his concurring opinion in *Lowe,* Justice Pierce made many of the same points as did the circuit court in *Karlo.* (*Lowe, supra,* 886 F.2d at pp. 1379-1381(conc. opn. of Pierce, J.).)

As for *McDonnell Douglas,* the Third Circuit viewed that court's observation that the RIF overall had a favorable impact on the entire group of employees over the age of 40, as "no more than an endorsement of the bottomline defense" repudiated in *Teal.* (*Karlo, supra,* 849 F.3d at p. 78.)  Nor did the circuit court credit *McDonnell's* concern that allowing subgroups might require an employer to attempt statistical parity, resulting in age-based decisions.  "[I]t has always been the case that 'a completely neutral practice will inevitably have some disproportionate impact on one group or another,' " but that "is precisely why deviating from statistical parity is not, by itself, enough to incur disparate-impact liability." (*Id.* at p. 79.)  Rather, disparate impact liability has always been limited " 'in key respects,' " including the requirement that the plaintiff identify a specific employment practice that causes the disparity and must prove that the disparity is *significant.*  (*Id.* at pp. 79-80.)  And even if a plaintiff makes out a prima facie case, the RFOA defense "imposes a relatively light burden on employers." (*Id.* at p. 80.)  "If a company's oldest employees are inadvertently disadvantaged by a merit-based policy, for example, the RFOA defense is designed to address just such a scenario." (*Ibid.*)

In sum, while the Third Circuit court recognized disparate impact "claims based on subgroups present unique challenges, the limitations applicable to any other disparate-impact case—evidentiary gatekeeping, the *prima facie* case, and affirmative defenses—are adequate safeguards." (*Karlo, supra,* 849 F.3d at p. 80.)

We find the reasoning of *Karlo,* and the other federal cases (as well as the concurring opinion in *Lowe*) reaching the same conclusion, more persua-

51

sive than that of the earlier cases.  We therefore conclude, for the reasons discussed in these cases, that disparate impact claims under the FEHA are not "limited to forty-and-other comparisons." (*Karlo, supra,* 849 F.2d at p. 80.)

In reaching this conclusion, we underscore, as did the Third Circuit, the significant limitations on disparate impact liability that the United States Supreme Court has emphasized, and which similarly, although not identically, apply to disparate impact liability under the FEHA.

The most significant difference between the ADEA and the FEHA in this regard is that the FEHA's "[b]usiness [n]ecessity" defense is not the equivalent of the ADEA's "reasonable factor other than age" defense.  FEHA regulations provide that:  "Where an employer or other covered entity has a facially neutral practice that has an adverse impact (i.e., is discriminatory in effect), the employer or other covered entity must prove that there exists an overriding legitimate business purpose such that the practice is necessary to the safe and efficient operation of the business and the challenged practice effectively fulfills the business purpose it is supposed to serve.  The practice may still be impermissible where it is shown that there exists an alternative practice that would accomplish the business purpose equally well with a lesser discriminatory impact." (Cal. Code Regs., tit. 2, § 11010; see generally Chin et al., Cal. Practice Guide: Employment Litigation (The Rutter Group 2020) ¶¶ 8:816, 8:830, pp. 8-115 to 8-116.)  This "business necessity" defense mirrors the same defense provided under Title VII.  (42 USC § 2000e-2(k)(1)(A)(i); see generally Cal. Practice Guide: Employment Litigation (The Rutter Group 2020) ¶ 8:830, p. 8-116; Senn, *Accommodating Good-Faith Employers in Title VII Disparate Impact Cases* (2020) 94 Tul. L.Rev. 639, 648-665 [discussing development of Title's VII "business necessity" defense and the ADEA's defense].)

This is not an insignificant difference, as the Supreme Court explained in *Smith,* in holding for the first time that disparate impact claims can be brought under the ADEA. While the high court concluded textual similarities of the ADEA and Title VII, and the court's prior recognition of disparate impact claims under Title VII, indicated like claims can be brought under the ADEA, the court went on to point out other dissimilarities made "clear . . . the scope of disparate-impact liability under the ADEA is narrower than under Title VII" (*Smith, supra,* 544 U.S. at p. 240), with the less stringent RFOA defense under the ADEA being the most significant. (*Id.* at pp. 239-241.) "Congress' decision to limit the coverage of the ADEA by including the RFOA provision is consistent with the fact that age, unlike race or other classifications protected by Title VII, not uncommonly has relevance to an individual's capacity to engage in certain types of employment. To be sure, Congress recognized that this is not always the case, and that society may perceive those differences to be larger or more consequential than they are in fact. However, as Secretary Wirtz noted in his report, 'certain circumstances . . . unquestionably affect older workers more strongly, as a group, than they do younger workers.' Wirtz Report 11. Thus, it is not surprising that certain employment criteria that are routinely used may be reasonable despite their adverse impact on older workers as a group. Moreover, intentional discrimination on the basis of age has not occurred at the same levels as discrimination against those protected by Title VII. While the ADEA reflects Congress' intent to give older workers employment opportunities whenever possible, the RFOA provision reflects this historical difference." (*Id.* at pp. 240-241; see *Karlo, supra,* 849 F.3d at p. 80 [pointing out that even if a plaintiff makes out a prima facie case of disparate impact age discrimination, "the RFOA defense imposes a relatively light burden on employers"].)

53

However, we do not think the difference between the RFOA defense under the ADEA  and the "[b]usiness [n]ecessity" defense under the FEHA is so great that it renders the other *stringent* requirements adherent to disparate impact claims insufficient protection against the perils the courts have identified in this context.  In *Carter* and *Katz*, for example, where the plaintiffs claimed disparate impact on older sub-groups within the protected 40-plus years of age class, the courts had no difficulty discerning the evidentiary shortcomings in the plaintiffs' claims.  (*Carter, supra,* 122 Cal.App.4th at pp. 1321-1326 [holding, as a matter of law, that plaintiff failed to establish a prima facie case of disparate impact age discrimination]; *Katz, supra,* 229 F.3d 831 at pp. 835-836 [affirming dismissal of disparate impact age discrimination claim as a matter of law]; *K.H., supra,* 263 F.Supp.3d at pp. 796-797 [granting summary judgment on disparate impact age discrimination claim].)

We also emphasize we are not confronted here with evidentiary issues concerning proffered statistical analyses and point out that cases like *Carter* and *Katz* illustrate the rigor with which such evidence must be examined in determining whether a plaintiff makes even a prima facie showing of disparate impact age discrimination.  As the circuit court emphasized in *Karlo,* "not just any disparity will make out the *prima facie* case [of disparate impact age discrimination]; the disparity must be significant.  See *Watson*, 487 U.S. at 995, . . . ('[S]tatistical disparities must be sufficiently substantial that they raise such an inference of causation.'); *Teal*, 457 U.S. at 446, . . . ('[T]he facially neutral employment practice [must have] had a significantly discriminatory impact.'); *Wards Cove* [*Packing Co. v. Atonion* (1989)], 490 U.S. [642,] 657, . . . (requiring a 'significantly disparate impact'), [superseded by statute on other grounds as stated in *Cota v. Tucson Police Depart.* (D.Ariz. 1992)

54

783 F.Supp. 458, 472, fn. 14]; *Hazelwood Sch. Dist. v. United States* [(1977)] 433 U.S. 299, 307–[3]08, . . . (requiring 'gross statistical disparities').'' (*Karlo, supra,* 849 F.3d at pp. 79–80; see *Villafana, supra,* 57 Cal.App.5th at pp. 1018-1020 [affirming dismissal of disparate impact sex and race discrimination claims where plaintiffs failed to allege proper comparison groups]; *Jumaane, supra,* 241 Cal.App.4th at pp. 1405-1407 [judgment notwithstanding verdict should have been granted on disparate impact race discrimination claim where plaintiff's statistical evidence was inadequate]; *Frank v. County of Los Angeles* (2007) 149 Cal.App.4th 805, 817-822 [reversing disparate impact race discrimination judgment where statistical evidence insufficient].)

Thus, while we conclude a disparate impact age discrimination claim under the FEHA is not foreclosed *solely* because it is predicated on alleged discriminatory impact on a sub-group within the protected age class, we express no opinion as to whether plaintiffs will be able to sufficiently plead such a claim, let alone raise a triable issue of age discrimination or prove such a claim.

## DISPOSITION

The judgment of dismissal is reversed and the case remanded for further proceedings consistent with this opinion. Appellants to recover costs on appeal.

_____
Banke, J.

We concur:


_____
Margulies, Acting P.J.


_____
Sanchez, J.

A158696, Mahler et al v. Judicial Council of CA

56

Trial Court: San Francisco City and County Superior Court

Trial Judge: Hon. Ethan Shulman

Counsel:

Furth, Salem, Mason & Li LLP, Daniel S. Mason, Quentin L. Kopp, and Thomas W. Jackson for Plaintiffs and Appellants.

Jones Day, Robert A. Naeve and Nathaniel P. Garrett for Defendants and Respondents.